## LOUISE DUKES ET AL. *v.* PETER DURANTE ET AL.
### (11425)
### (11479)

PETERS, HEALEY, PARSKEY, SHEA and SPONZO, Js.

Argued November 10, 1983—decision released February 7, 1984

Charles G. Albom, corporation counsel, with whom were *Deborah L. Morgan,* deputy corporation counsel, and, on the brief, *Karen S. Nash* and *Clarine N. Riddle,* deputy corporation counsel, for the appellants (defendants).

*Michael O. Sheehan,* with whom was *Joanne G. Gibau,* for the appellees (plaintiffs).

PARSKEY, J. These appeals arise from a permanent mandatory injunction compelling the defendants to provide adequate replacement housing for persons displaced under the Uniform Relocation Assistance Act, General Statutes §§ 8-266 through 8-282 (hereinafter the act or URAA). At issue is the proper construction of that act.

## I

The underlying facts of appeal No. 11425, having been stipulated to, are not in dispute. The plaintiffs are

former residents of New Haven who brought a class action on behalf of all tenants in the city of New Haven who have been ordered or may be ordered in the future to move from their apartments by the Housing Conservation and Code Enforcement Agency of New Haven (HCCEA) without first being assured of decent, safe, and sanitary replacement housing in the city, as allegedly required by the URAA. The defendants are Peter R. Durante, who as the executive director of the HCCEA has the power to condemn under the city housing code; Louis Naclerio, who as the director of the relocation office of the city's redevelopment agency has the responsibility of providing a relocation assistance program for all city agencies, including HCCEA; John P. Sawyer, development administrator of the city; and the city itself.[1]

Acting pursuant to the city housing code, the defendant Durante condemned the plaintiffs' dwelling units because they were unsafe and unfit for human habitation. As a result, the plaintiffs and their families, who are economically disadvantaged, were forced to vacate their apartments. But for the condemnation, the plaintiff Louise Dukes would have remained in the substandard apartment. After diligent attempts to locate housing, the plaintiffs were provided emergency shel-

---

[1] The complaint named Peter R. Durante and Louis Naclerio as the defendants and, as a result, the temporary injunction was issued against them alone. Subsequently, John P. Sawyer and the city of New Haven were added as defendants. In ruling on the permanent injunction, the court, *Foti, J.,* adopted the temporary injunction, which bound only defendants Durante and Naclerio, as the permanent injunction. Hence, technically the permanent injunction does not obligate defendants Sawyer and the city. At oral argument, however, counsel for all the defendants stated that the city has defended this suit and he "would like a resolution to this [URAA] question. I'm not here on technicalities." When asked if he was not going to press the point, counsel answered, "I'll concede on that." Moreover, the parties have treated the judgment as applying to the city and for the purposes of this appeal, we will follow the parties. *Birgel* v. *Heintz,* 163 Conn. 23, 25–26, 301 A.2d 249 (1972).

ter by the state department of human resources. For Dukes and her six children, this consisted of two rooms in a motel in West Haven. The plaintiff Nereida Febus and her four children were provided with one room at the same motel. These accommodations had no cooking facilities and the motel was far from the children's schools in New Haven. The children had difficulty getting to school and Febus had difficulty providing even one hot meal a day to her family.

Housing is scarce in New Haven. It is particularly scarce for a welfare family with many children. At the time the plaintiffs' housing was condemned, there was no decent, safe, and sanitary housing available to them and their families, and a wait of five months or longer for an apartment for families like them was not unusual. On the average, each year thirty families are displaced due to condemnation under the housing code. Prior to the injunction, Naclerio's only assistance to these displacees was to refer them to the housing authority and to supply them with a list of landlords, some of whom were housing code violators. The defendants did not ascertain before condemnation that decent, safe and sanitary replacement housing was available.

The plaintiffs sought a temporary and permanent injunction to compel the defendants to provide adequate housing for those families previously displaced by the city's housing code enforcement activity who could not themselves secure such housing, and to ensure that in the future there would be decent, safe and affordable housing available to such families, prior to displacement. The defendants denied that they had such obligations.

On February 24, 1981, the trial court, *Berdon, J.,* certified the class. He also granted a mandatory temporary injunction which, as later amended on July 30, 1981, by agreement of the parties, obligated the defendants

to, inter alia, provide emergency shelter for displacees for two weeks after condemnation, and at the end of the two week period, to provide temporary housing containing a kitchen and adequate sleeping and living space for up to four months. The defendants were ordered to pay a relocation benefit of that portion of the shelter cost (rent, heat and utilities) of the temporary housing that exceeded 35 percent of the displacee's income and to provide transportation to schools if the housing was outside New Haven. Within four months of the order to vacate, the defendants had to provide permanent, decent, safe and sanitary housing in an area not generally less desirable in regard to public and commercial facilities than the area from which the displacees had moved and at rents or prices not exceeding 35 percent of the displacee's income, but including up to $83.33 a month as a relocation benefit. For those class members previously displaced and living in housing which they could not afford, the city was ordered to make housing supplement payments, retroactive to February 15, 1981, for any shelter cost which was above 35 percent of the displacee's income or 35 percent plus $83.33 if statutory monthly relocation benefits were paid. By March 3, 1982, the date of the stipulation of facts, the city had appropriated $100,000 for the improvement of apartments and spent additional money to provide rental subsidies in order to comply with this injunction.

On January 20, 1982, the case was transferred to the housing docket of the New Haven judicial district. On March 3, 1982, the defendants filed a motion requesting that, if the plaintiffs received a judgment, a hearing be held on the dimensions of the relief. On April 30, 1982, the court, *Foti, J.,* upheld the class certification and rendered judgment in favor of the plaintiffs. Without ruling on the defendants' motion for a separate hearing on the scope of the relief, the court adopted

the temporary injunction as the permanent injunction. On May 3, 1982, the defendants filed a motion to open judgment and reargue. This motion was denied.

On appeal, the defendants argue that the court erred in holding that (1) the URAA applies to persons displaced by housing code enforcement; (2) the URAA, so applied, is not a gift, in violation of article first, section one of the Connecticut constitution; (3) the plaintiffs need not have exhausted their administrative remedies. In addition, the defendants argue that the terms of the injunction were unduly harsh.

## A

The defendants' first claim is that the URAA does not cover the plaintiffs and the class because (1) they do not meet the statutory definition of "displaced person" because they were displaced by housing code enforcement activity, not building code enforcement activity; (2) their displacement did not occur as the result of a "program or project" of the city;[2] and (3) the code enforcement activity did not result in the "acquisition" of the condemned property.

The URAA begins at General Statutes § 8-266 with a statement of purpose which reads: "Sec. 8-266. SHORT TITLE. PURPOSE. POLICY. This chapter shall be known as the uniform relocation assistance act. The purpose of this chapter is to establish a uniform policy for the fair and equitable treatment of persons displaced by the acquisition of real property by state and local land acquisition programs, by building code enforcement activities, or by a program of voluntary rehabilitation of buildings or other improvements conducted pursuant to governmental supervision. Such policy shall be uniform as to (1) relocation payments, (2) advisory assistance, (3) assurance of availability of standard housing,

---

[2] There is no contention that a city is not a state agency for the purposes of the URAA. General Statutes § 8-267 (1).

and (4) state reimbursement for local relocation payments under state assisted and local programs." It is followed by a definitional section, § 8-267, which in relevant part provides: "(3) 'Displaced person' means . . . (b) any person who so moves as the direct result of code enforcement activities or a program of rehabilitation of buildings pursuant to such governmental program or under such governmental supervision."

The defendants contend that building code enforcement differs from housing code enforcement in that the former regulates the erection and alteration of structures, while the latter regulates the maintenance of buildings already constructed. They contend that § 8-266 specifically singles out building code activity to trigger the benefits of the act, and that the more general reference in § 8-267 (3) to "code enforcement activities" relates back to § 8-266. Moreover, the defendants assert that the words "acquisition" and "program or project" that appear throughout the act, and "construction" that is found in § 8-272 (a),[3] are associated with building code activity. The plaintiffs counter that the interchangeable use of the words "building code enforcement activities" in § 8-266 and "code enforcement activities" in § 8-267 (3) compels the conclusion that "building code" in the URAA is a generic term that embodies all codes dealing with the health and safety requirements of buildings. They point to legislative intent, subsequent amendments and their

---

[3] "[General Statutes] Sec. 8-272. NECESSITY OF PROVISION OF HOUSING. (a) If a project or program cannot proceed to actual construction because comparable replacement sale or rental housing is not available, and the commissioner of transportation for transportation projects or the commissioner of housing for any other state agency program or project determines that such housing cannot otherwise be made available after consultation with the chief executive officer of the municipality within which such project or program occurs, he may take such action as is necessary or appropriate to provide such housing by use of funds authorized for such project or program, the provisions of any other state statute to the contrary notwithstanding."

legislative history, other statutes and common sense to buttress their position.[4] We agree with the plaintiffs.

When faced with ambiguity in a statute, as we are here, we must resort to the rules of statutory construction. "It is an elementary rule of construction that statutes should be considered as a whole, with a view toward reconciling their separate parts in order to render a reasonable overall interpretation; the application, moreover, of common sense to the statutory language is not to be excluded. *United Aircraft Corporation* v. *Fusari,* 163 Conn. 401, 411, 311 A.2d 65 (1972); *Garbaty* v. *Norwalk Jewish Center, Inc.,* 148 Conn. 376, 382, 171 A.2d 197 (1961). We must avoid a consequence which fails to attain a rational and sensible result which bears most directly on the object which the legislature sought to obtain. *United Aircraft Corporation* v. *Fusari,* supra, 414; *Bridgeport* v. *Stratford,* 142 Conn. 634, 644, 116 A.2d 508 (1955); *Sage-Allen Co.* v. *Wheeler,* 119 Conn. 667, 679, 179 A. 195 (1935)." *La Providenza* v. *State Employees' Retirement Commission,* 178 Conn. 23, 29, 420 A.2d 905 (1979). " 'In construing a statute a court considers its legislative history, language, purpose and the circumstances surrounding its enactment. *Delinks* v. *McGowan,* 148 Conn. 614, 618, 173 A.2d 488 [1961]; *Cassidy* v. *Tait,* 140 Conn. 156, 160, 98 A.2d 808 [1953].' *State* v. *Sober,* 166 Conn. 81, 91n, 347 A.2d 61 [1974]." *Winchester* v. *State Board*

---

[4] The plaintiffs also point to the administering agency's interpretation of the act, which should be accorded deference. *Roy* v. *Centennial Ins. Co.,* 171 Conn. 463, 473, 370 A.2d 1011 (1976). It is true that in seven cases the department of housing has construed building code to encompass housing code and has awarded benefits to persons displaced by the housing code. Yet, recently it has reversed this position. *Gavin* v. *Canale,* H-8207-870-HD (September 13, 1983) *(Maloney, J.)*. Moreover, its recent predecessor, the department of economic development (which included the division of housing), came to an opposite conclusion and denied benefits; *Anderson* v. *Stockton,* 0049237S (March 24, 1980) *(Hadden, J.);* while an earlier predecessor, the department of community affairs, granted benefits. Hence, deference to the administrative agency only begs the question.

*of Labor Relations,* 175 Conn. 349, 356, 402 A.2d 332 (1978). In our attempt "to attain a rational and sensible result" we draw on those resources available to us.

There is no legislative history accompanying the enactment of the URAA in 1971. There is, however, evidence that the legislature intended "building code" to include municipal housing codes. In the state building code; General Statutes § 29-251 et seq.; which was enacted in 1945[5] and repeatedly amended, the legislature explicitly differentiated between that code and others by referring to it as the "state building code" throughout the chapter. In 1969, the session before the enactment of the URAA, the legislature amended this code to provide: "The state building code . . . shall be the building code for all towns, cities, and boroughs." Public Acts 1969, No. 443, presently codified in General Statutes § 29-253. Later in 1976, in Public Acts 1976, No. 76-95, entitled "Rights and Responsibilities of Landlord and Tenant," presently codified in General Statutes § 47a-1 et seq., the legislature used "building and housing codes" interchangeably.[6] Since the legislature is presumed to act with existing relevant statutes in mind and to create a consistent body of law; *Smith* v. *Zoning Board of Appeals,* 174 Conn. 323, 327, 387 A.2d 542 (1978); the clear implication is that when the legislature meant the state building code it so stated, and when it meant the term to be generic it referred to "building codes."

---

[5] General Statutes (1945 Rev.) § 102h provided in part: "Sec. 102h. PREPARATION OF STATE BUILDING CODE. The Connecticut State Housing Authority is authorized to prepare a state building code, the purpose of which shall be to regulate the design, construction and use of buildings or structures hereafter erected and the alteration of buildings or structures heretofore erected."

[6] General Statutes § 47a-1 (b) provides:
"(b) 'Building and housing codes' include any law, ordinance or governmental regulation concerning fitness for habitation or the construction, maintenance, operation, occupancy, use or appearance of any premises or dwelling unit."

That the term "building code" was meant to be generic is further supported by the legislative history accompanying amendments to the URAA. "[W]hile the views of subsequent [legislatures] cannot override the unmistakable intent of the enacting one, *Teamsters* v. *United States,* 431 U.S. 324, 354, n.39, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977), such views are entitled to significant weight, *NLRB* v. *Bell Aerospace Co.,* 416 U.S. 267, 275, 40 L. Ed. 2d 134, 94 S. Ct. 1757 (1974), and particularly so when the precise intent of the enacting [legislature] is obscure." *Seatrain Shipbuilding Corporation* v. *Shell,* 444 U.S. 572, 596, 100 S. Ct. 800, 63 L. Ed. 2d 36 (1980).

In 1979, while discussing clarifying amendments to the URAA, Senator Sanford Cloud, the co-chair of the committee having jurisdiction over such legislation, explained to the senate: "This act which was originally passed in 1971 was designed to insure that farms and businesses and individuals who are forced to relocate because of *governmentally caused displacement* receive advisory assistance in relocating and are compensated within specified limits for any additional expenses which they incur as a result of that displacement." (Emphasis added.) 22 S. Proc., Pt. 14, 1979 Sess., p. 4859. This reference to "governmentally caused displacement" rather than state building code displacement suggests that the legislature envisioned the act to apply to all persons forced to move because of any government caused displacement.

In 1982, the legislature amended General Statutes §§ 8-268 and 8-270 and added § 8-270a to provide that cities could seek reimbursement from landlords for that assistance provided to tenants displaced by code enforcement. These amendments and their legislative history demonstrate that the legislature understood the term "building code" to be generic. As Representative Paul Garavel, the co-chair of the committee of juris-

diction explained, "[u]nder Connecticut law, a municipality which condemns an occupied building as a result of a program of code enforcement is required to provide relocation assistance to any tenant whom it orders out of the building. It may not simply throw them out onto the streets. This bill would give municipalities a means of partial reimbursements by permitting them to recoup their payments from the landlord if the landlord through failure to comply with the law, permitted the buildings to decline to a point of condemnation." 25 H. R. Proc., Pt. 16, 1982 Sess., pp. 5369–70. Condemning buildings because of decay which renders them unsafe is housing code enforcement. If the defendants are correct that the URAA encompasses building code enforcement only, then this amendment would not have been necessary for the city would not have had to pay relocation assistance in the first place. Moreover, throughout the debate in the General Assembly, the legislators used the term "building code" interchangeably with or in addition to the term "housing code."[7]

Finally, at that same session the legislature was presented with an opportunity to limit the act to building code activity and chose not to do so. Raised Committee Bill 5801 sought to amend § 8-279 by adding a new subsection which provided, "(NEW) (g) This chapter shall not apply to persons who are displaced as a result of housing code enforcement by municipal officials," while Raised Committee Bill 5807 provided, "(NEW) (g) Nothing in this chapter shall be construed as requiring a state agency to make payments to or provide relocation advisory services for any person displaced as a result of building or housing code enforcement activities." At the public hearing held by the Judiciary Committee, both Michael Morris, special assistant

---

[7] See, for example, the comments of Representatives Thomas Brunnock and Paul Garavel, 25 H. R. Proc., Pt. 16, 1982 Sess., pp. 5372–81 and of Senator Howard Owens, 25 S. Proc., Pt. 12, 1982 Sess., p. 3997.

corporation counsel for New Haven, presenting testimony on behalf of defendant Durante, and the plaintiffs' lawyer, Elaine Gordon, testified about the situation in New Haven and the temporary injunction. Judiciary Committee, Pt. 3, 1982 Sess., pp. 794–98, 807–22. The committee chose not to report out either bill.[8] Hence, it is clear from the legislative history of the act that the legislature intended it to apply to persons displaced by the housing code.

The defendants' reliance on the terms "acquisition," "program and project" and "construction" does not persuade us otherwise. That an acquisition of the property is not required in every case to trigger the benefits of the act was made clear in the 1979 amendments. Public Acts 1979, No. 79-518 amended the definition of § 8-267 (3) by adding, inter alia, "OR" before subsection (b), thereby setting it apart from subsection (a) which requires an acquisition.[9] In addition, it changed §§ 8-268 (a) and 8-271 (a) from "[w]henever the acquisition of real property for a program or project undertaken by a state agency will result in the displacement of any person . . ." to "[w]henever a program or project undertaken by a state agency or under the supervision of a state agency will result in the displacement of any person . . . ." In explaining these amendments

---

[8] The full General Assembly was not unaware of the financial burden the cities faced when they displaced people under their housing codes. For example, Representative William Scully spoke about the situation in Waterbury:

"We're not here to abandon people underneath this bill, but you've got to understand when you're talking about $12,000 for one building, and we're making a $25,000 cut in the Reading is Fun Program which children need today, you've got to realize that we need this money for other social programs that are very worthy." 25 H. R. Proc., Pt. 16, 1982 Sess., p. 5380.

[9] General Statutes § 8-267 (3) provides:

"(3) 'Displaced person' means (a) any person who, on or after July 6, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by or supervised by a state agency or unit of local government and solely for the purposes of subsec-

Senator Cloud stated on the floor of the senate: "The statement of purpose clearly defines those cases to which this act shall apply. Despite the language . . . and the use of similar language in the definitional section, the remainder of the act only makes reference to displacement caused by acquisition of real property for a program or project undertaken by a state agency. *Because of the inconsistency in the existing language some town's have refused to provide assistance called for by the act in any situation in which it did not actually acquire property. When such cases are appealed under provisions of this act the Dept. of Economic Development has ruled that the act's coverage is correctly stated in [the] statement of purpose section."* (Emphasis added.) 22 S. Proc., Pt. 14, 1979 Sess., pp. 4859–60.

Thus, it is clear that the statute does not require an acquisition when the displacement is the result of code enforcement activity. *McNally* v. *Middletown Township,* 182 N.J. Super. 622, 625, 442 A.2d 1075 (1982). In the face of these amendments and the legislative history, the defendants' reliance on federal cases construing the Federal Uniform Relocation Assistance and the Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 et seq., is not helpful because the federal statute requires an acquisition while our statute does not. See Pearlman & Baar, "Beyond the Uniform Relocation Act: Displacement by State and Local Government," 10 Clearinghouse Rev. 329 (1976).

We are also unpersuaded by the defendants' contention that the terms "program or project" envision

tions (a) and (b) of section 8-268 and section 8-271 as a result of the acquisition of or as a result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business or farm operation, for such program or project; or (b) any person who so moves as the direct result of code enforcement activities or a program of rehabilitation of buildings pursuant to such governmental program or under such governmental supervision."

something more than code enforcement activity. They suggest that the word "project" is usually associated in the governmental context with public works, and that code enforcement is a function, not a program. Webster's Third New International Dictionary defines program as "a plan of procedure." In the absence of legislative history to the contrary, we find that housing code enforcement activity on a city wide basis constitutes a plan of procedure. See *Andeen* v. *Emmaus Nursing Home,* 256 N.W.2d 290, 291 (Minn. 1977).

The only place the word "construction" appears in the act is in § 8-272 (a).[10] The fact that it does not appear in other sections suggests that it pertains to the specific situation described in that section, that is, when displacement occurs because of construction and there is no available replacement housing, some of the construction project funds can be channeled into replacement housing costs. This provision does not abrogate the relief afforded to those displaced under housing codes.

Nor are we persuaded by the defendants' argument that such an interpretation of the statute necessarily imposes a crippling financial burden on the cities. Every housing code violation need not result in condemnation. The defendants stipulated that most of the condemned units had a history of code violations known to the HCCEA prior to the condemnation. The HCCEA can attempt to prevent the decay by requiring the landlord to make the necessary repairs.[11] If the landlord does not comply or has abandoned the property the HCCEA can impose civil penalties or press criminal charges.

---

[10] See footnote 3, supra.

[11] If these repairs result in a very short displacement, the URAA is not thereby triggered. Indeed, when the effect of the repairs is to render the building safe, decent and habitable, the purpose of the URAA is served without the aid of its benefits.

General Statutes § 47a-52 (e).[12] In those cases where condemnation is required, the city can secure repayment for the displacement costs by imposing a priority lien on the landlord's real property; General Statutes §§ 8-268 and 8-270; or by bringing a civil proceeding against any noncomplying landlord, including one who has abandoned the property. General Statutes § 8-270a.

Moreover, common sense and reason compel the conclusion that the defendants cannot act under the housing code, which is to protect the health and safety of the occupants, and then abandon the displacees. It is not the purpose of the housing code to make no housing at all better than substandard housing. Indeed, in those buildings where displacement is necessary, the nomenclature of the violations is irrelevant. Whether condemnation results from burst pipes or falling ceilings, the result is an unsound structure.

"No community remains static. Buildings become old, rundown and eventually uninhabitable. Municipalities cannot close their eyes to this, nor can they abdicate their obligation to prepare for such an occurrence." *Rowe* v. *Pittsgrove Township,* 153 N.J. Super. 274, 284, 379 A.2d 497 (1977). The defendants stipulated that in the last several years, the HCCEA has condemned about thirty apartments under the housing code and expects this rate to continue or grow in the future, and that the condition of most of these housing units was known to the HCCEA prior to the condemnation. Thus, it is possible for the defendants to plan for the relocation of a predictable number of people. Given our holding today, it is their duty.

---

[12] We are aware of the fact that with respect to at least one building, the HCCEA did over the years require the landlord to make repairs and obtained a warrant for his arrest when he did not comply.

## B

The defendants assert that the URAA violates article first, § 1, of the constitution of Connecticut, which provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community." They argue that the plaintiffs' condemned dwellings were of no value and that the act awarded them compensation greater than their economic loss, thereby bestowing upon them an unconstitutional privilege. The act, the defendants continue, favors poor people over middle class people who seek decent housing but are not displaced by housing code enforcement activity. These claims are without merit.

Article first, § 1 "prohibits the adoption of legislation that has no public purpose but operates to confer private gain on an individual or group. *Tough* v. *Ives,* 162 Conn. 274, 292–93, 294 A.2d 67 (1972); *Lyman* v. *Adorno,* 133 Conn. 511, 515–16, 52 A.2d 702 (1947). Where, however, the statute does serve a public purpose, the legislature may constitutionally differentiate between classes of persons, so long as the legislative classification bears a rational relationship to the public purpose sought to be served. *Caldor's, Inc.* v. *Bedding Barn, Inc.,* 177 Conn. 304, 315, 417 A.2d 343 (1979); *Tough* v. *Ives,* supra; *State ex rel. Higgins* v. *Civil Service Commission,* 139 Conn. 102, 106, 90 A.2d 862 (1952)." *Beccia* v. *City of Waterbury,* 192 Conn. 127, 134, 470 A.2d 1202 (1984).

That this legislation serves a valid public purpose cannot be questioned. Prior to the displacement of people from their homes, there must be somewhere for them to go. The act does not prefer one economic group over another. Indeed, the very purpose of the URAA is to provide for uniform assistance and the fair and

equitable treatment of any person displaced by governmental conduct. "[I]f an act serves a proper public purpose, the fact that it incidentally confers a direct benefit upon some individual or individuals" does not render it invalid. *Lyman* v. *Adorno,* supra, 516. The defendants have failed to prove beyond a reasonable doubt that the URAA is unconstitutional. *Eielson* v. *Parker,* 179 Conn. 552, 557, 427 A.2d 814 (1980).

## C

Section 8-278 of the act provides that "[a]ny person . . . aggrieved by any agency action, concerning eligibility for relocation payments authorized by this chapter, may appeal such determination to the commissioner of transportation . . . or to the commissioner of housing . . . ." The defendants claim that the court erred in not requiring the plaintiffs to exhaust their administrative remedies. We do not agree.

"This court . . . has repeatedly affirmed the principle that when an adequate administrative remedy is provided by law, it should be exhausted." *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson,* 173 Conn. 352, 357, 377 A.2d 1099 (1977). We have also held "that a party need not exhaust an inadequate or futile administrative remedy." *Greenwich* v. *Liquor Control Commission,* 191 Conn. 528, 541–42, 461 A.2d 1369 (1983). This is particularly true when the relief sought is equitable and the administrative agency has no power to compel such relief. See *Bianco* v. *Darien,* 157 Conn. 548, 554, 254 A.2d 898 (1969).

Section 8-278 is limited to determinations of "eligibility for relocation payments." The plaintiffs' claim for injunctive relief was premised on the defendants' failure to provide decent, safe and adequate housing prior to displacement. Section 8-278 does not grant the

commissioners any authority to provide such relief. Resort to this administrative remedy would have been futile.

## D

The defendants contend that the terms of the injunction are unduly harsh and are unsupported by the record. Specifically, they claim that since housing is scarce in New Haven and that since it takes five months for a poor family to find an apartment, the effect of the injunction is to require them to create and build housing for the plaintiffs under unreasonable time constraints. In addition, they claim that the injunction is defective because, in violation of General Statutes § 8-270, it orders a flat relocation benefit of $4000 rather than up to $4000, and it does not limit this benefit to those who occupied the condemned unit for at least ninety days prior to displacement.

There has been extensive testimony on the defendants' efforts to comply with the injunction. The city has plans to rehabilitate buildings it owns and it has worked with the housing authority to rehabilitate some of its units. The rehabilitation of the housing authority units takes from five to eight weeks, sometimes longer. In addition, the city has set aside $400,000 to acquire a building which after rehabilitation will serve as temporary housing for twelve families.

Section 8-271 (a) requires the city to provide displaced persons with a relocation assistance advisory program. Section 8-271 (b) provides that "[e]ach relocation advisory assistance program required by subsection (a) shall include such measures, facilities, or services as may be necessary or appropriate in order . . . (3) to assure that, within a reasonable period of time, prior to displacement there will be available in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within

the financial means of the families and individuals displaced, decent, safe and sanitary dwellings . . . equal in number to the number of and available to such displaced persons who require such dwellings and reasonably accessible to their places of employment. . . ." Although the act and the injunction are silent as to how the defendants are to comply with this section, the injunction imposes rigid time limits for compliance. The defendants have chosen to proceed by rehabilitating existing structures, yet these efforts were found to be inadequate. See discussion of Appeal No. 11479, infra. We believe the existing rehabilitation program satisfies the purposes and requirements of § 8-271.

The granting of injunctive relief is within the trial court's discretion. In exercising this discretion, the court must balance the competing interests of the parties; *Berin* v. *Olson,* 183 Conn. 337, 343, 439 A.2d 357 (1981); and "[t]he relief granted must be compatible with the equities of the case." *Dupuis* v. *Submarine Base Credit Union, Inc.,* 170 Conn. 344, 356, 365 A.2d 1093 (1976). Nothing in § 8-271 or any other section of the act requires the defendants to engage in a construction program, city wide or otherwise, nor do the equities in this case require such a drastic measure. Although a city is not precluded from choosing to construct new buildings in order to meet its obligations under the act, it would be a rare case that would justify an injunction mandating such a course. If such an effort is required under this injunction or if the effect of the time frame of this injunction is to require construction, then this relief is "greatly disproportionate to the injury of which the plaintiff complains." *Moore* v. *Serafin,* 163 Conn. 1, 6, 301 A.2d 238 (1972). If such action is not required, then the time frame of the injunction, the effect of which is to render the defendants' rehabilitation program unacceptable, is too short and inflexible.

While we do not sanction foot dragging by the defendants, we believe the judgment should be clarified so as not to be construed as requiring a building program and to give the defendants a reasonable time frame in which to proceed with the necessary rehabilitation.

As to the defendants' other challenges to the scope of the injunction, there is no error. Section 8-270 awards "(1) the amount necessary to enable such displaced person to lease or rent for a period not to exceed four years, a decent, safe, and sanitary dwelling . . . but not to exceed four thousand dollars." Paragraph 8 of the injunction does not order a flat payment of $4000, but provides that *"up to* $83.33 [$4000 divided by four years] may be added to the 35% of the monthly income figure to determine the maximum shelter cost that is affordable . . . ." (Emphasis added.)

Section 8-270 conditions this relocation benefit on the requirement that the displaced person have lived in the dwelling for at least ninety days prior to the condemnation. The injunction cannot and does not dispense with this requirement.[13] The plaintiffs seem to suggest that this requirement was abrogated by Regs., Conn. State Agencies § 8-273-7, which provides: "A displaced person's eligibility for payment of moving and related expenses is not affected by the length of time that he occupied the real property from which he is displaced." Since a regulation cannot overrule the statute; *State ex rel. Huntington* v. *McNulty,* 151 Conn. 447, 449, 199 A.2d 5 (1964); it is clear that this regulation pertains to § 8-268, which deals with the payment of moving expenses.

---

[13] In Appeal No. 11479, discussed infra, the trial court did confer certain benefits of the act on two plaintiffs who had not met this ninety day requirement. Our decision that that appeal is moot precludes us from discussing whether those plaintiffs were entitled to such benefits.

## II

The facts underlying Appeal No. 11479 are as follows: On April 8, 1982, a New Haven building was condemned as unfit for human habitation, resulting in the displacement of five families. Although motel accommodations were provided, the plaintiffs were not placed in temporary housing as required by the temporary injunction. In fact, they remained in the motel until June 19, 1982. On May 12, 1982, the plaintiffs moved for contempt.[14] At the hearings, which were held on May 17 and 18, the defendants argued, inter alia, that it was impossible to comply with the terms of the injunction. The trial court, *Foti, J.,* found that, although it was difficult and costly for the defendants to comply, it was "far from impossible." On May 21, 1982, he found the defendants to be in contempt but allowed them until June 19, 1982, to place the plaintiffs in permanent housing. The defendants complied with this order and no sanctions were imposed. On appeal the defendants press their claim that their inability to comply with the injunction exculpates them from a finding of contempt. We need not address this challenge, for we find this appeal to be moot.

It is a well settled rule that when the issue presented is purely academic, this court will not decide the matter. *State* v. *Macri,* 189 Conn. 568, 569, 456 A.2d 1203 (1983); *Connecticut Foundry Co.* v. *International Ladies Garment Workers Union,* 177 Conn. 17, 19, 411 A.2d 1 (1979); *Young* v. *Tynan,* 148 Conn. 456, 459, 172 A.2d 190 (1961). This appeal has been rendered academic by the defendants' compliance with the order.

At oral argument, the defendants urged that, though they located housing for these five families, the issue

---

[14] In the interim, on April 28, 1982, the trial court granted a permanent injunction.

is still viable because this is a class action. We do not agree. A finding of contempt depends upon the facts and circumstances surrounding it. We will not speculate as to whether the issue will be presented again and under what circumstances.

In Appeal No. 11479, the appeal is dismissed; in Appeal No. 11425, the judgment is affirmed, except with respect to the relief afforded, where the judgment is set aside and the case is remanded for further proceedings not inconsistent with this opinion.

In this opinion the other judges concurred.