Moroni and Susan CARLIE and Deena Poulsen, on her own behalf and as guardian for Lora Poulsen, a minor, Plaintiffs and Appellants,

v.

John MORGAN, in his official capacity as acting director of the Salt Lake City/County Health Department, Daryl McDonald, Joe Destafino, and Jon Hansen, in his official capacity as a building official for the city of South Salt Lake, Defendants and Appellees.

No. 940475.

Supreme Court of Utah.

June 25, 1996.

Bruce M. Plenk, Silvia Pena–Chacon, Eric Mittelstadt, Salt Lake City, for plaintiffs.

Thomas L. Christensen, Salt Lake City, for Morgan.

Dean H. Becker, Salt Lake City, for McDonald and Destafino.

Dale J. Lambert, Stacy L. Hayden, Salt Lake City, for Hansen.

ZIMMERMAN, Chief Justice:

Moroni and Susan Carlie and Deena Poulsen, who were displaced from their apartment when the building was closed to occupancy due to health code violations, appeal from the district court's dismissal of their claims against (i) John Morgan, acting director of the Salt Lake City/County Health Department, for failing to provide relocation assistance under the Utah Relocation Assistance Act ("URAA"), Utah Code Ann. §§ 57–12–1 to –13; (ii) Daryl McDonald, the owner of the apartment building, for violating the Utah Consumer Sales Practices Act ("UCSPA"), Utah Code Ann. §§ 13–11–1 to –23; and (iii) Joe Destafino, the manager of the apartment building, for violating the UCSPA

and breaching the implied warranty of habitability.[1] We affirm.

The material facts in this appeal are not disputed. In December of 1992, Deena Poulsen rented an apartment from Joe Destafino, who managed the apartment building for its owner, Daryl McDonald. Three months later, the Carlies rented an apartment in the same building. Shortly thereafter, James Bennett of the Salt Lake City/County Health Department ("Health Department") inspected the building and found numerous health code violations, including plumbing leaks, cockroach and rodent infestation, unsafe stairs, missing window glass, and missing smoke detectors. Consequently, on April 15, 1993, Bennett posted a "Closed to Occupancy" notice on the building and ordered plaintiffs to vacate the premises.

Two weeks later, having been unable to find affordable alternate housing, the Carlies filed a complaint in district court seeking (i) relocation assistance under the URAA from the acting director of the Health Department, John Morgan, and (ii) damages from McDonald and Destafino for violation of the UCSPA and breach of the implied warranty of habitability. Poulsen was later added as a plaintiff.

Thereafter, Morgan moved for summary judgment, arguing that the URAA does not require a governmental agency to provide relocation assistance to a displaced person unless the displacement occurs as a result of the agency's acquisition of the property from which the person was displaced. The district court agreed and dismissed plaintiffs' claim against Morgan for failing to provide relocation assistance.

Plaintiffs subsequently moved for summary judgment against McDonald and Destafino for violating the UCSPA and breaching the implied warranty of habitability. After a hearing on plaintiffs' motion, the district court ruled that (i) McDonald was lia-ble for breach of the implied warranty of habitability; (ii) Destafino, as McDonald's agent, was not personally liable for breach of the implied warranty of habitability; and (iii) the UCSPA does not apply to landlord/tenant transactions. Accordingly, the district court entered summary judgment against McDonald on plaintiffs' claim for breach of the implied warranty of habitability and dismissed plaintiffs' other claims against McDonald and Destafino. Plaintiffs appeal.

■ We first state the applicable standard of review. Plaintiffs challenge only the district court's interpretation of the URAA and the UCSPA and the district court's legal conclusion that an apartment owner's agent cannot be held personally liable for breach of the implied warranty of habitability. These are legal determinations, i.e., "those which are not of fact but are essentially of rules or principles uniformly applied to persons of similar qualities and status in similar circumstances." *State v. Pena*, 869 P.2d 932, 935 (Utah 1994). "Accordingly, we grant no particular deference to the district court's rulings but review them for correctness." *World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 259 (Utah 1994) (citing *Ward v. Richfield City*, 798 P.2d 757, 759 (Utah 1990)); *accord Pena*, 869 P.2d at 936.

■ Plaintiffs first contend that the district court erred in concluding that the URAA requires a governmental agency to provide relocation assistance only when the agency acquires the property in question. "When faced with a question of statutory construction, we look first to the plain language of the statute." *CIG Exploration, Inc. v. Utah State Tax Comm'n*, 897 P.2d 1214, 1216 (Utah 1995) (citing *State v. Larsen*, 865 P.2d 1355, 1357 (Utah 1993); *Schurtz v. BMW of N. Am., Inc.*, 814 P.2d 1108, 1112

---

**1.** Jon Hansen, a building official for the city of South Salt Lake, and the City of South Salt Lake were also included as defendants in the district court proceeding. However, we can find nothing in plaintiffs/appellants' briefs which challenges the district court's grant of summary judgment to these defendants. The court specifically found that "Inspector Jon Hansen and South Salt Lake City did not close the apartment complex. The City has no responsibility for the health department's actions." Because plaintiffs/appellants have not challenged this ruling, Jon Hansen and South Salt Lake City are not properly parties to this appeal and the district court's grant of summary judgment in their favor is final.

(Utah 1991)), *cert. denied,* —— U.S. ——, 116 S.Ct. 699, 133 L.Ed.2d 656 (1996). We assume that "each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable." *Savage Indus., Inc. v. Utah State Tax Comm'n,* 811 P.2d 664, 670 (Utah 1991). "Only when we find ambiguity in the statute's plain language need we seek guidance from the legislative history and relevant policy considerations." *World Peace Movement,* 879 P.2d at 259. Applying these principles, the district court found that the plain language of the URAA requires governmental acquisition of property before relocation assistance can be provided. We agree.

The URAA provides specific remedies to persons displaced from their place of residence or business as a result of governmental activity. *See* Utah Code Ann. § 57–12–4 (direct financial assistance); *id.* § 57–12–5 (reimbursement of moving expenses); *id.* § 57–12–7 (offer of replacement dwelling); *id.* § 57–12–8 (creation of relocation assistance advisory program). By their express terms, however, these remedial provisions apply only when a governmental agency acquires property. For example, section 57–12–4 authorizes governmental agencies to provide direct financial assistance only to "persons displaced *by acquisition of real property* by [the] agency." *Id.* § 57–12–4 (emphasis added). Sections 57–12–5, –7, and –8 are likewise limited in their application to instances in which the displacing agency acquires the property in question: section 57–12–5 requires reimbursement of certain moving expenses by "[a]ny agency *acquiring real property* " (emphasis added); section 57–12–7 guarantees that no person will be displaced from "land used as his residence *and acquired under any of the condemnation or eminent domain laws of this state* " without first being offered a comparable replacement dwelling (emphasis added); and section 57–12–8 requires the creation of a relocation assistance advisory program only when *"the acquisition of real property* ... will result in the displacement of any person" (emphasis added). We find no ambiguity in this language and accordingly conclude that the URAA does not entitle displaced persons to relocation assistance unless the displacement resulted from governmental acquisition of real property.

In opposition, plaintiffs argue that such a reading of the URAA would render some of its provisions meaningless, contrary to "our fundamental duty to give effect, if possible, to every word of the statute." *Madsen v. Borthick,* 769 P.2d 245, 252 n. 11 (Utah 1988). Specifically, plaintiffs direct our attention to sections 57–12–2 and –3(3), both of which mention "code enforcement activities." Section 57–12–2 provides in relevant part:

> [T]he purpose of this act is to establish a uniform policy for the fair and equitable treatment of persons displaced by the acquisition of real property by state and local land acquisition programs, *by building code enforcement activities,* or by a program of voluntary rehabilitation of buildings or other improvements conducted pursuant to governmental supervision.

(Emphasis added.) Section 57–12–3(3) defines "displaced person" as

> any person who ... moves from real property ... as a result of the acquisition of the real property, in whole or in part, or as a result of a written order of the acquiring agency to vacate real property for a program of purchase undertaken by an agency or *as a direct result of code enforcement activities.*

(Emphasis added.) Plaintiffs assert that these provisions are meaningless unless we read the URAA to provide relief to persons displaced as a result of code enforcement. We disagree.

Because the legislature's intent in referring to "code enforcement activities" in sections 57–12–2 and –3(3) is not readily apparent, we read those sections in the context of the URAA as a whole. *See CIG Exploration,* 897 P.2d at 1216. As we explained above, in contrast to the intent and definition sections that contain references to "code enforcement activities," all of the URAA's remedial provisions expressly and unambiguously require governmental acquisition of property. In light of this express requirement, we accept the district court's explanation that the URAA's references to code

enforcement were meant to "appl[y] to situations where code enforcement is coupled with an agency's acquisition of property such as through the exercise of an agency's powers of eminent domain to reclaim property out of compliance with health and safety standards." *See* Utah Code Ann. § 17A–2–1238 (authorizing redevelopment agencies to acquire property by eminent domain). Thus, while we acknowledge that the references to code enforcement in sections 57–12–2 and –3(3) are a source of justifiable confusion,[2] we do not think that our reading of the URAA necessarily renders those sections meaningless.

Plaintiffs cite several cases from other jurisdictions in which courts seized on statutory language similar to that contained in sections 57–12–2 and –3(3) to require governmental agencies to provide relocation assistance to persons displaced solely as a result of code enforcement activities. *See Dukes v. Durante,* 192 Conn. 207, 471 A.2d 1368, 1375–76 (1984); *Lau v. Bautista,* 61 Haw. 144, 598 P.2d 161, 166–67 (1979) (per curiam); *McNally v. Township of Middletown,* 182 N.J.Super. 622, 442 A.2d 1075, 1077 (N.J.Super.Ct.App.Div.1982). These cases, however, are easily distinguishable and are therefore not helpful in analyzing the URAA.

In contrast to the remedial provisions of the URAA, all of which expressly require governmental acquisition of property, the relocation assistance act at issue in *Dukes* had been amended to require relocation assistance "[w]henever *a program or project* undertaken by a state agency or under the supervision of a state agency will result in the displacement of any person." 471 A.2d at 1375 (emphasis added). Because the prior version of the statute required relocation assistance "[w]henever the *acquisition of*

real property for a program or project undertaken by a state agency will result in the displacement of any person," the court concluded that the amendment was intended to dispense with the acquisition requirement. *Id.* (emphasis added). No such amendment has been made to the URAA.

In *Lau,* the plaintiffs were displaced after a city ordered their landlord to demolish the building in which they lived due to its substandard condition. 598 P.2d at 165–66. Although the court held that the plaintiffs were "displaced persons" as defined in Hawaii's relocation assistance act, the court did not squarely address the question presented in the instant case, i.e., whether a displaced person is entitled to relocation assistance when the displacing agency has not acquired the property in question. Rather, the court apparently assumed, without examining the language of the relocation assistance act's remedial provisions, that any "displaced person" was entitled to relocation assistance. *Id.* at 167. Likewise, in *McNally,* the court ignored the remedial provisions of New Jersey's relocation assistance act and considered only the act's statement of purpose to conclude that the plaintiff, who was displaced as a result of code enforcement, was entitled to relocation assistance. 442 A.2d at 1077. Unlike the courts in *Lau* and *McNally,* we refuse to read sections 57–12–2 and –3(3) in isolation from the rest of the URAA. We therefore affirm the district court's dismissal of plaintiffs' claim against Morgan.

Plaintiffs next contend that the district court erred in concluding that the UCSPA does not apply to landlord/tenant transactions. The UCSPA generally "prohibits deceptive or unconscionable acts or practices

---

2. Plaintiffs suggest that the URAA was modeled after Department of Housing and Urban Development ("HUD") regulations which, at the time the URAA was enacted, included in the definition of "displaced person" those persons displaced as a result of code enforcement activities. *See* 24 C.F.R. §§ 42.20(d)(iii), 42.55(c)(3) (1973). Therefore, plaintiffs argue, the URAA should be interpreted to require relocation assistance whenever such assistance would have been required by the HUD regulations. However, in contrast to the URAA's remedial provisions, the analogous provisions of the HUD regulations

were not conditioned on governmental acquisition of property but instead applied to all "displaced persons," including those displaced by code enforcement activities. *See, e.g., id.* § 42.65. The conspicuous absence of any reference to "displaced persons" in those sections of the URAA under which plaintiffs seek relocation assistance, coupled with the express condition that relocation assistance need not be provided unless a governmental agency acquires the property in question, indicates that the URAA was *not* meant to provide relief coextensive with that available under then-existing HUD regulations.

by a supplier in connection with a consumer transaction." *Wade v. Jobe*, 818 P.2d 1006, 1013–14 (Utah 1991). Although certain types of transactions are specifically excluded from the application of the UCSPA, the UCSPA does not expressly include or exclude residential leases, "nor was there any indication in the floor debate prior to the statute's enactment whether the legislature intended to include landlord/tenant transactions within its application." *Id.* at 1014. Although three members of the court found it unnecessary to address this issue in *Wade*, 818 P.2d at 1018 (Howe, Assoc. C.J., concurring in part), the lead opinion of Justice Durham, joined by this author, concluded that "the renting of residential housing is a consumer transaction within the meaning of the UCSPA." *Id.* at 1016. However, in reaching this conclusion, the lead opinion in *Wade* did not consider the effect of the more specific Utah Fit Premises Act because it was enacted after that case arose. Today we conclude that because the legislature addressed the precise aspects of the landlord/tenant relationship presented here and in *Wade*, the lead opinion's dictum in *Wade* is effectively undermined as it would apply to the facts before us. Therefore, we conclude that the UCSPA does not provide a remedy in the instant case where plaintiffs are seeking damages caused by the uninhabitable condition of their apartments.

■ To explain, in 1990 the legislature enacted the Utah Fit Premises Act, Utah Code Ann. §§ 57–22–1 to –6, which provides specific remedies to residential tenants whose rental units become uninhabitable due to violations of health and safety standards. *See id.* § 57–22–6. It is precisely this type of violation with which we are concerned in the instant case. In contrast, the UCSPA focuses generally on deceptive and unconscionable sales practices. Following our long-standing rule of statutory construction that "[s]pecific statutes control over more general ones," *State v. Lowder*, 889 P.2d 412, 414 (Utah 1994), we hold that plaintiffs may not resort to the UCSPA under the facts alleged.[3] Although plaintiffs might have been entitled to

recover under the Utah Fit Premises Act, they did not comply with its notice requirements and therefore do not seek to avail themselves of its remedies.

■ Finally, we address plaintiffs' claim that the district court erred in concluding that Destafino, as McDonald's agent, was not personally liable for breach of the implied warranty of habitability. The district court reasoned that "the implied warranty of habitability is made by the landlord as part of the contract with the tenant" and that the warranty therefore binds only the landlord, not the landlord's agent. We agree.

■ In *Wade*, we adopted the implied warranty of habitability as a contractual provision implicit in all residential leases. 818 P.2d at 1010. In general, the implied warranty of habitability requires landlords to maintain safe and sanitary housing fit for human habitation. *Id.* at 1011–11. As a contractual provision, the implied warranty of habitability may not be enforced against an agent who lawfully entered into the lease on behalf of a disclosed principal. *Stoiber v. Honeychuck*, 101 Cal.App.3d 903, 162 Cal. Rptr. 194, 207 (1980); *Johnson v. Scandia Assocs., Inc.*, 641 N.E.2d 51, 57 (Ind.Ct.App. 1994); *see also Jones v. Schlender*, 102 Idaho 776, 640 P.2d 1177, 1179 (1982); *Shebester v. Triple Crown Insurers*, 826 P.2d 603, 609 (Okla.1992); *Hogan v. Postin*, 695 P.2d 1042, 1045 (Wyo.1985); 3 Am.Jur.2d *Agency* § 302 (1986) ("If a contract is made with a known agent acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone and the agent cannot be held liable thereon . . . ."); *cf. Marveon Sign Co. v. Roennebeck*, 694 P.2d 604, 604 (Utah 1984) (noting that agent is personally liable on contract entered into for undisclosed principal). Because the plaintiffs in the instant case do not allege that Destafino failed to disclose that he was acting as McDonald's agent when he rented the premises to them, Destafino cannot be held personally liable for breach of the implied warranty of habitability. We therefore affirm the dis-

---

**3.** We do not decide whether the UCSPA applies to landlord/tenant transactions under circum- stances not covered by the Utah Fit Premises Act.

missal of plaintiffs' claim against Destafino for that alleged breach.

Affirmed.

DURHAM, J., concurs.

HOWE, Justice, concurring:

I concur. I write to more fully explain why I think the Utah Consumer Sales Practices Act (UCSPA) does not apply in this case.

As pointed out in the lead opinion in *Wade v. Jobe*, 818 P.2d 1006, 1014 (Utah 1991), the UCSPA is modeled after the Uniform Consumer Sales Practices Act, which was drafted by the National Conference of Commissioners on Uniform State Laws and is narrower than some other model consumer protection statutes. The Uniform Act defines a "consumer transaction" as a "sale, lease, assignment, award by chance, or other disposition of an item of goods, a service, or an intangible (except securities)." *Id.* The Utah Act contains the same definition of a consumer transaction except that it includes "property, both tangible and intangible except securities and insurance." Utah Code Ann. § 13–11–3(2). In a comment to the definition of a consumer transaction in the Uniform Act, the drafters stated, "On the assumption that land transactions frequently are, and should be, regulated by specialized legislation, they are excluded altogether." *Wade*, 818 P.2d at 1014.

In the lead opinion in *Wade*, this comment was noted but given no effect because our version of the Uniform Act does not contain that comment. So far as this author knows, however, comments by the drafters of uniform acts are not written into the statute when Utah adopts a version of a uniform act but are nevertheless considered relevant when seeking legislative intent. The lead opinion relied upon the fact that the Utah version, as pointed out above, applied to "property both tangible and intangible" and argued that since tangible property can be either real or personal property, it followed that the Utah Act was meant to apply to residential rental leases and agreements. *Id.*

Versions of the Uniform Act have been enacted in two other states, Ohio and Kan-

sas. The supreme courts in both of those states have held that their versions of the Uniform Consumer Sales Practices Act did not apply to residential lease transactions. *Heritage Hills, Ltd. v. Deacon*, 49 Ohio St.3d 80, 551 N.E.2d 125, 127 (1990) (relying on the drafters' comment); *Chelsea Plaza Homes, Inc. v. Moore*, 226 Kan. 430, 601 P.2d 1100, 1104 (1979). Moreover, the Uniform Act was approved by the National Conference of Commissioners on Uniform State Laws and by the American Bar Association in 1970. Unif. Consumer Sales Practices Act, 7A U.L.A. 231 (1985). In accordance with the drafters' comment that the Uniform Act was not meant to apply to land transactions such as landlord/tenant transactions, the National Conference of Commissioners on Uniform State Laws just two years later in 1972 approved a Uniform Residential Landlord and Tenant Act. *Chelsea Plaza Homes*, 601 P.2d at 1103. Kansas has enacted versions of both the Uniform Consumer Sales Practices Act and the Uniform Residential Landlord and Tenant Act. *Id.* In *Chelsea Plaza Homes*, a tenant, in an action by her landlord to evict her, counterclaimed, alleging violations of the Residential Landlord and Tenant Act, and averred them to be deceptive practices under the Consumer Sales Practices Act. The court held:

> Clearly, the Consumer Protection Act covers a very broad area of transactions; whereas, the Residential Landlord and Tenant Act covers one very specific small area of transactions, and is complete within itself for that area. We therefore must conclude that for all transactions within its purview the Residential Landlord and Tenant Act controls and preempts the field.

*Id.* at 1104.

*Chelsea Plaza Homes* was followed in *Heritage Hills, Ltd.*, where the court held that Ohio's statutes for resolving landlord/tenant disputes excluded application of Ohio's version of the Uniform Consumer Sales Practices Act. Similarly, in *State v. Schwab*, 103 Wash.2d 542, 693 P.2d 108, 110 (1985), the court held that violations of Washington's Residential Landlord Tenant Act do not also constitute violations of its Consumer Protection Act.

While Utah has not adopted the Uniform Residential Landlord and Tenant Act, our legislature in 1990 enacted a somewhat similar but narrower act entitled the Utah Fit Premises Act, Utah Code Ann. §§ 57–22–1 to –6. This act was not considered in *Wade* because that case arose before passage of the act. The Fit Premises Act contains specific provisions as to a tenant's rights and remedies when a landlord allows the premises to become uninhabitable such as in the instant case. The Act provides for the tenant to give the landlord written notice to correct and remedy conditions which fall below health and safety standards. The landlord then has the option to (1) refuse to correct the substandard conditions and terminate the rental agreement, refunding to the tenant all unused rent along with any deposits, or (2) remedy the unhealthy or unsafe conditions. Only in the event that the landlord does not timely exercise either option may the tenant then seek damages, injunctive relief, and attorney fees as provided for in the Act.

In sum, I agree with the lead opinion that the specific provisions of the Fit Premises Act dealing with violations of health and safety standards which make rented premises uninhabitable should prevail over the general provisions of the Utah Consumer Protection Act. The latter Act focuses on deceptive and unconscionable sales practices with which we are not concerned in the instant case. We are here concerned only with uninhabitable conditions of the rented premises, not with any deception practiced upon the tenant by the landlord nor with provisions in a lease which are arguably unconscionable. The legislature has clearly spoken in the area of uninhabitable conditions in rented premises and has provided specific remedies in the Fit Premises Act.

STEWART, Associate C.J., and RUSSON, J., concur.