2004 UT App 143

**Terry GILLMAN, on behalf of himself and all others similarly situated, Plaintiff and Appellant,**

v.

**SPRINT COMMUNICATIONS COMPANY, L.P.; and John Does 1–10, whose true names are unknown, Defendants and Appellees.**

No. 20030349–CA.

Court of Appeals of Utah.

May 6, 2004.

Denver C. Snuffer Jr., Nelson, Snuffer, Dahle & Poulsen, Sandy, and Jesse L. Rid-

dle, Riddle & Associates, PC, Draper, for Appellant.

Robert S. Clark, Paul C. Drecksel, and Justin P. Matkin, Parr, Waddoups, Brown, Gee & Loveless, Salt Lake City, for Appellees.

Before Judges BILLINGS, DAVIS, and ORME.

## OPINION

BILLINGS, Presiding Judge:

¶ 1 Terry Gillman appeals the trial court's order granting summary judgment to Sprint Communications Company, L.P. (Sprint) and dismissing Gillman's claims brought under the Unsolicited Commercial and Sexually Explicit Email Act (the Act). *See* Utah Code Ann. §§ 13–36–101 to –105 (2002). We affirm.

## BACKGROUND

¶ 2 On April 14, 2002, Gillman agreed to receive promotional email from Audio Galaxy, an online music service, when he registered on Audio Galaxy's website. Traffix, Inc. (Traffix), and its subsidiary GroupLotto, subsequently obtained Gillman's email address from Audio Galaxy. The trial court concluded that Gillman had conceded that at this time he had a business relationship not only with Audio Galaxy, but also with Traffix and GroupLotto.[1] On or about May 14, 2002, GroupLotto began sending promotional email to the addresses Traffix had received from Audio Galaxy. The promotional email advertised Sprint's long-distance telephone service.

¶ 3 On May 14, 2002, Gillman requested that GroupLotto remove his email address from its distribution list. GroupLotto removed Gillman's email address from its list

on May 15, 2002. However, GroupLotto did not remove Gillman's email address from those email promotions already queued to be sent. As a result, on May 16, 2002, Gillman received an email (the Email) from GroupLotto advertising Sprint's long-distance service.

¶ 4 On May 28, 2002, Gillman filed a class action lawsuit against Sprint, alleging that the Email was an unsolicited commercial email that violated the Act. On November 1, 2002, Sprint moved for summary judgment on numerous grounds. On February 28, 2003, the trial court granted Sprint's motion for summary judgment on the following ground: the Email was not "unsolicited" as the term is defined in the Act, and thus not regulated by the Act, because Gillman had a "preexisting relationship" with its sender, GroupLotto. Gillman appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 5 Gillman contends that the trial court erred by granting summary judgment to Sprint when it interpreted the Act as failing to regulate the Email as an "unsolicited" email. A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). When reviewing a grant of summary judgment, "[w]e view all facts and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party" and review the trial court's conclusions of law for correctness. *Lovendahl v. Jordan Sch. Dist.*, 2002 UT 130, ¶ 13, 63 P.3d 705.

## ANALYSIS

¶ 6 The Act regulates commercial email only if it is "unsolicited." Utah Code Ann.

---

1. The Act does not regulate commercial email where its "sender has a preexisting business or personal relationship with the recipient." Utah Code Ann. § 13–36–102(8)(b) (2002). Although Gillman had registered on Audio Galaxy's website, the trial court considered Gillman to have a "business relationship" with GroupLotto because (1) Sprint presented evidence that Gillman opted to receive GroupLotto email when he used Audio Galaxy's website, and Gillman never disputed this fact, thereby waiving the issue, *see* Utah R.

Civ. P. 56(c), and (2) Gillman's arguments in the trial court presuppose that Gillman had a business relationship with GroupLotto which Gillman then terminated. We agree with the trial court. Thus, we need not, and do not, decide whether and under what conditions having a business relationship with one company enables that company to sell one's email address to a second company and thereby "transfer" its business relationship with the recipient to the second company.

§ 13–36–103 (2002). Gillman argues that the trial court erred by finding that because Gillman had a "preexisting" relationship with GroupLotto, the Email was not an "unsolicited" email under the Act. Sprint argues that the plain language of the statute supports the interpretation adopted by the trial court.

¶ 7 "When faced with a question of statutory construction, we look first to the plain language of the statute." *Carlie v. Morgan,* 922 P.2d 1, 3 (Utah 1996) (quotations and citations omitted). "We assume that each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable." *Id.* (quotations and citation omitted). "Only when we find ambiguity in the statute's plain language need we seek guidance from the legislative history and relevant policy considerations." *Id.* at 4 (quotations and citation omitted). It is the plain meaning of a statute that provides notice of its applications, and thus, unless the plain meaning is ambiguous or fails to make sense of the statute as a whole, we do not look beyond the text. *See Beehive Bail Bonds v. Fifth Dist. Court,* 933 P.2d 1011, 1013 (Utah Ct.App.1997). The trial court applied these principles to conclude that the Email was not "unsolicited" as the term is defined by the Act. We agree.

¶ 8 The Act regulates "unsolicited commercial email." Utah Code Ann. § 13–36–103. The Act defines the term "unsolicited" to mean "without the recipient's express permission," but expounds upon the definition as follows: "A commercial email is not 'unsolicited' if the sender has a preexisting business or personal relationship with the recipient." *Id.* § 13–36–102(8) (2002). Gillman was the recipient of the Email and GroupLotto was its sender.[2] Thus, the dispositive issue is whether Gillman had a "preexisting business relationship" with GroupLotto. If there was

a preexisting business relationship, then the Email was not unsolicited, and thus, not regulated by the Act.

¶ 9 Gillman argues that he had no "preexisting" relationship with GroupLotto on May 16, 2002, when he received the Email, because he had terminated his relationship with GroupLotto on May 14, 2002. However, Gillman's interpretation of the Act ignores the prefix "pre" in the word "preexisting." "We assume that each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable." *Carlie,* 922 P.2d at 4 (quotations and citation omitted).

¶ 10 The literal meaning of the term "preexisting" does not support Gillman's interpretation. While Gillman's termination of his relationship with GroupLotto on May 14, 2002, demonstrates that the two entities had no *existing* relationship on May 16, 2002, it does not demonstrate that they had no *preexisting* relationship. Webster's International Dictionary defines "preexist" as "to exist earlier." Webster's Third New International Dictionary (unabridged) 1787 (3d ed.1986). Thus, whether one has a preexisting relationship depends essentially upon whether the relationship existed earlier, not whether the relationship continues to exist. We cannot ignore the Legislature's choice to include the prefix "pre." We are bound by the literal meaning of "preexisting" unless it leads to an interpretation of the Act that is "unreasonably confused and inoperable."

¶ 11 Gillman argues that reading the term "preexisting" according to its plain meaning entails that once one establishes a business or personal relationship with a sender, one cannot terminate that relationship and bring any subsequent email from that sender within the scope of the Act. Gillman then argues that such an interpretation not only renders

---

**2.** While Gillman correctly points out that Sprint caused the Email to be sent, he acknowledges that the Email actually was sent by GroupLotto. The Act explicitly distinguishes those who "send" commercial email from those who "cause to be sent" commercial email, which permits Sprint to be liable for an email sent by GroupLotto if Sprint caused GroupLotto to send it. *See* Utah Code Ann. § 13–36–103(1) to (2) (2002). How-

ever, when the Act defines the term "unsolicited," it refers to "the sender" as the one with whom the recipient must have a preexisting relationship. *Id.* § 13–36–102(8)(b). Use of the definite article "the" indicates that there is only one sender whose preexisting relationship is at issue—one who actually sends the email. Thus, GroupLotto is "the sender" of the Email.

the Act inoperable, but also makes the opt-out procedure specified in the Act superfluous. *See* Utah Code Ann. § 13–36–103 (2002). We disagree.

¶ 12 The Act regulates all commercial email sent without "the recipient's express permission" where the sender has no "preexisting business or personal relationship with the recipient." *Id.* § 13–36–102(8). All such commercial email is termed "unsolicited" under the Act. *Id.* Thus, the Act, and specifically its opt-out requirement, is directed only to those who send commercial email without the recipient's consent and without first having established a business or personal relationship with the recipient. This distinction is reasonable and does not render the opt-out procedure superfluous or the Act inoperable. Therefore, the plain meaning of the language chosen by the Legislature governs.[3]

## CONCLUSION

¶ 13 Because Gillman had a preexisting relationship with GroupLotto, the sender of the Email, the Email was not unsolicited, and thus was not regulated by the Act. Because the Email was not regulated by the Act, neither GroupLotto, which sent the Email, nor Sprint, which caused the Email to be sent, is liable under the Act. Therefore, the trial court did not err by dismissing Gillman's claim against Sprint.[4] Accordingly, we affirm.

¶ 14 WE CONCUR: JAMES Z. DAVIS and GREGORY K. ORME, Judges.

---

**3.** If the plain meaning of the language of the Act does not reflect the Legislature's actual intent, then it is the Legislature that must change the language of the Act. However, such a change is likely unnecessary because there now exists federal legislation in this area that likely preempts state laws such as the Act. *See* 15 U.S.C. §§ 7701 to –7713 (2004).

**4.** Because we affirm the trial court's order on statutory grounds, we need not address Sprint's constitutional arguments under the Commerce Clause, *see* U.S. Const, art. I, § 8, cl. 3, Free Speech Clause, *see* U.S. Const. amend. I, and Due Process Clause, *see* U.S. Const. amend. XIV. *See State v. Wood*, 648 P.2d 71, 82 (Utah 1982) ("It is a fundamental rule that we should avoid addressing a constitutional issue unless required to do so.").