[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 7429
This is a case of first impression concerning the meaning of General Statutes § 46a-64c, Connecticut's fair housing statute.[1] The issues in this case concern specifically a provision added by amendment in 1989 which prohibits discrimination based on "lawful source of income." The principal question is whether it is discrimination under the terms of this statute to refuse to rent to a person who receives rent subsidies under the federal program commonly referred to as Section 8[2]
because of that program's requirements.
The parties stipulated to the following facts: The Commission on Human Rights and Opportunities (CHRO) is a state agency whose duties include the enforcement of General Statutes § 46a-64c. (Stipulation of Facts, ¶ 1.) Sullivan Associates, a general partnership, owned four residential properties including 700 and 702 Lindley Street in Bridgeport. (Stipulation of Facts, ¶¶ 2-3.) Sullivan Associates dissolved on June 30, 1994 but it had been served with the complaints involved in this case before that date. (Stipulation of Facts, ¶ 4.)
Patricia Hanson is a single parent of two minor children. (Stipulation of Facts, ¶ 7.) On March 2, 1994, Sullivan Associates ran an advertisement in the Connecticut Post stating that a three bedroom house on Lindley Street was for rent for $750 per month. (Stipulation of Facts, ¶ 10.) Hanson telephoned the number in the advertisement and spoke to Jane Swetckie, Robert Sullivan's secretary. (Stipulation of Facts, ¶ 11.) Hanson told Swetckie that her family consisted of herself and two children, and that her income derived from Section 8 and AFDC. (Stipulation of Facts, ¶ 11.) Swetckie responded that the landlord did not qualify for Section 8 because the landlord required two months rent as security and Section 8 would not allow two months security as the landlord understood the program. (Stipulation of Facts, ¶ 12.)
Sabine Kuczo, an employee of the Bridgeport Fair Housing Office, then called in regard to the advertisement and spoke to Swetckie. (Stipulation of Facts, ¶ 13) Kuczo Stated that her name was Lori Williams, her household consisted of herself and her two children, she was unemployed, she was on Section 8 and received money from the state. (Stipulation of Facts, ¶ 13.) Although Kuczo insisted she had the money to pay the additional security deposit, Swetckie told her that Section 8 was not CT Page 7430 allowed. (Stipulation of Facts, ¶ 13.)
Rose Ann Janosov, the Fair Housing Officer of the City of Norwalk, then telephoned Sullivan Associates regarding the advertisement at the request of the Director of Bridgeport Fair Housing/Fair Rent. (Stipulation of Facts, ¶ 14.) Janosov spoke to Swetckie and gave her name as Janice Rosanov. (Stipulation of Facts, ¶ 14.) Janosov told Swetckie that she worked and that her household consisted of herself and her two children. (Stipulation of Facts, ¶ 14.) Swetckie then gave her the particulars on the house. (Stipulation of Facts, ¶ 14.) Janosov told her that she would like to drive by and see the area and Swetckie told her the address of the house. (Stipulation of Facts, ¶ 14.) The parties do not know whether Janosov had disclosed her true income, a fictitious qualifying income, or was not asked her income, before being given the address. (Stipulation of Facts, ¶ 14.)
In March of 1994, Hanson's monthly gross income was $1,361 ($602 in rental assistance toward a rent at the time of $650, $581 from AFDC and $178 in food stamps). (Stipulation of Facts, ¶ 8.) Had she been accepted as a tenant, her Section 8 rental assistance would have been increased to $739 per month ($600 base contract rent subsidy plus $139 for utilities). (Stipulation of Facts, ¶ 9.) She would have paid $11 to the landlord, which, added to the subsidy of $739, would have paid the $750 rent, and she would then have paid the utilities in full. (Stipulation of Facts, ¶ 9.) The landlord estimates that the utility expense would be approximately $227 per month. (Stipulation of Facts, ¶ 9.)
Patricia Roper is a single mother with three children. (Stipulation of Facts, ¶ 16.) On April 18, 1994, Roper called Swetckie in response to the advertisement in the Connecticut Post. (Stipulation of Facts, ¶ 20.) In response to Swetckie's questions, Roper stated that her household consisted of herself and three children and that she had no income other than Section 8. (Stipulation of Facts, ¶ 20.) Swetckie informed Roper that she would need an annual income of $38,000 in order to qualify for the apartment. (Stipulation of Facts, ¶ 20.)
In April 1994, Roper's monthly income was $1,533 per month ($631 in rental assistance toward a rent at the time of $700, $776 in Social Security disability benefits and $126 in food stamps). (Stipulation of Facts, ¶¶ 17, 41.) Had she been accepted as a CT Page 7431 tenant, her Section 8 rental assistance would have been increased to $686 per month ($547 base contract rent subsidy and $139 allowance for utilities). (Stipulation of Facts, ¶ 18.) Therefore, she would have paid $64 to the landlord, which, added to the subsidy of $686, would have paid the $750 rent. (Stipulation of Facts, ¶ 18.) With her remaining cash income, she would have been responsible for the estimated $228 in monthly utilities. (Stipulation of Facts, ¶ 18.)
The house at 700 Lindley Street was subsequently rented to Elizabeth McGrath on May 17, 1994. (Stipulation of Facts, ¶ 21.) McGrath's income and credit did not meet Sullivan Associates' standards. (Stipulation of Facts, ¶ 21.) Therefore, Sullivan Associates required McGrath's mother, Marjorie Campos, to provide a lease guarantee. (Stipulation of Facts, ¶ 21.) McGrath's weekly income was $555 from employment and child support; Campos' income included Social Security. (Stipulation of Facts, ¶ 21.) The combined weekly incomes exceeded the monthly rent as required by Sullivan Associates. (Stipulation of Facts, ¶ 21.)
On June 6, 1994, Sullivan Associates placed another advertisement in the Connecticut Post stating that a house at 702 Lindley Street was for rent for $725 per month. (Stipulation of Facts, ¶ 22.) Roper contacted Sullivan Associates about the apartment and spoke with Swetckie. (Stipulation of Facts, ¶ 23.) Swetckie again informed Roper that the landlord required a tenant who had an annual salary of $38,000. (Stipulation of Facts, ¶ 23.) Swetckie stated that she would not rent the apartment to Roper because she did not have an annual income of $38,000. (Stipulation of Facts, ¶ 23.)
The procedure followed by Sullivan Associates in renting available units is as follows: An advertisement is placed in the newspaper. (Stipulation of Facts, ¶ 25.) The telephone number provided is that of Robert Sullivan's office and callers speak to him or to his secretary, Jane Swetckie. (Stipulation of Facts, ¶ 25.) Callers are asked to provide the following information: their name, who else is living with them, what is the gross household income and will it be a problem to produce the first months rent and two months security. (Stipulation of Facts, ¶¶ 26-30.) If the caller answers the questions to the satisfaction of Sullivan Associates then the caller is given the location of the unit and invited to drive by it. (Stipulation of Facts, ¶ 31.) If the caller finds the location suitable, a CT Page 7432 showing is then arranged. (Stipulation of Facts, ¶ 31.) If the inquirer is still interested after the showing, Sullivan Associates then requires a written application, verification of identity by means of a photo ID, verification of income, references from former landlords, and a credit check. (Stipulation of Facts, ¶ 32.) After the information is provided by the applicant, Sullivan Associates then tenders a written lease. (Stipulation of Facts, ¶ 33.)
As of 1994 Sullivan Associates was unwilling to alter or modify any of its terms; any applicant who refused to sign the lease as written was rejected. (Stipulation of Facts, ¶ 33.) As a matter of policy, Sullivan Associates has kept rental units vacant for as long as six months rather than rent them to financially unqualified tenants. (Stipulation of Facts, ¶ 38.) The managing partner of Sullivan Associates is unaware of any Section 8 certificate holder or voucher holder who successfully passed the telephone screen and was permitted to submit a written application. (Stipulation of Facts, ¶ 40.) Sullivan Associates, however, did rent a dwelling unit from July 1, 1988 through June 30, 1989 to a person whose rent was subsidized by the Department of Mental Retardation's Housing Subsidy Program. (Stipulation of Facts, ¶ 40.) In that instance, no lease addendum was required, two month's security was paid, and the lease was guaranteed by the individual's mother, whose income met Sullivan Associates' standards. (Stipulation of Facts, ¶ 40.)
Hanson filed a complaint with the CHRO on March 17, 1994. (Stipulation of Facts, ¶ 15.) On June 10, 1994, Roper filed a complaint with the CHRO. (Stipulation of Facts, ¶ 24.) Robert P. Sullivan, the managing general partner of Sullivan Associates, elected to require the CHRO to proceed by civil action on both complaints pursuant to General Statutes § 46a-83 (d). (Stipulation of Facts ¶¶ 2, 5.) The action on Hanson's complaint was commenced with a petition dated October 19, 1994 and filed with the court immediately thereafter. Hanson's action was assigned Docket No. 9410-02569. (Stipulation of Facts, ¶ 15.) The action on Roper's complaint was filed with the court on December 8, 1994 and assigned the Docket No. 9412-02620. (Stipulation of Facts, ¶ 24.) On March 8, 1996, the CHRO filed a motion to consolidate the actions of Hanson and Roper. Sullivan Associates had no objection to the motion for consolidation. The court heard oral argument regarding this matter on February 27, 1998. CT Page 7433
Sullivan Associates says that it rejected the relators as prospective tenants because it objects to the terms of Section 8 leases and the relators did not meet its minimum income requirement. CHRO claims that the relators were rejected because of their status as Section 8 participants. CHRO argues that not agreeing to the terms of a Section 8 lease and/or setting the income minimum too high is equivalent to discrimination, contending that landlords have no legitimate business reasons not to participate in Section 8.
Sullivan Associates argues that § 46a-64c does not mandate participation in Section 8 and at under CHRO's interpretation, the relators would have a greater chance than others in low income brackets who do not receive Section 8 subsidies. Sullivan Associates concedes that its policies may be economic discrimination but it is not a violation of the statute, which allows decisions to be made on the basis of insufficient income. Sullivan Associates also argues that nothing in the statute requires it to make accommodations in its policies when a prospective tenant presents a Section 8 voucher.
CHRO argues that legislative history reveals the intention to include Section 8 subsidies under "housing assistance" so that a landlord's refusal to participate in Section 8 when it rents an apartment that is within the range that Section 8 will subsidize is discrimination under the statute. In other words, CHRO infers from the inclusion of Section 8 in the definition of housing assistance that the statute mandates participation in Section 8.
Section 8 authorizes a public housing authority to make assistance payments "for the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). Qualified families are issued rental vouchers that allow them to rent directly from private landlords and pay a small share of the rent commensurate with family income. 42 U.S.C § 1437f(f);24 C.F.R. § 982.302. The rest is paid directly to the landlord by the housing authority under a separate contract with the landlord. 42 U.S.C. § 1437f(d); 24 C.F.R. § 982.451.
To qualify as a landlord under Section 8, a property owner must maintain the rental unit in compliance with the housing quality standards enumerated in 24 C.F.R. § 882.109. In addition, the rent must be no more than the fair market rent for CT Page 7434 the geographic region as determined by HUD, and may be adjusted on an annual basis. 24 C.F.R. § 888.111 et seq. When a landlord agrees to rent to a Section 8 recipient, he must agree to the terms of the program and incorporate the Section 8 lease addendum into the lease with the tenant. 24 C.F.R. § 982.308. Landlords who have previously accepted Section 8 tenants are prohibited from discriminating against new applicants for other qualified properties because of their Section 8 status.42 U.S.C. § 1437f(t).
There is nothing in the federal regulations that requires an eligible landlord to participate in the Section 8 program. "The Section 8 program is voluntary. A private landlord may choose not to accept any tenants who receive Section 8 assistance. However, the statute forbids a landlord from picking and choosing from among holders of Section 8 certificates. Thus, once a landlord chooses to participate by accepting a Section 8 tenant, it cannot turn away subsequent Section 8 certificate holders based on their status as Section 8 participants." Salute v. Greens, 918 F. Sup. 660,663 (E.D.N.Y. 1996).
 I
The issue before the court is whether § 46a-64c can be construed to mean that all landlords who qualify for participation in Section 8 must participate in the program, so that it is discrimination within the meaning of the statute to refuse to accept the terms of a Section 8 lease or to set a minimum income requirement that automatically disqualifies low income tenants.
"It is fundamental that statutory construction requires us to ascertain the intent of the legislature and to construe the statute in a manner that effectuates that intent. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation. . . . In order to determine the meaning of a statute, we must consider the statute as a whole when reconciling its separate parts in order to render a reasonable overall interpretation." (Citations omitted; internal quotation marks omitted.) Angelsea Productions, Inc. v. CHRO, 236 Conn. 681, 688,674 A.2d 1300 (1996). CT Page 7435
The language at issue in § 46a-64c was originally part of § 46a-64, which prohibits discriminatory public accommodations practices. Public Acts 1989, No. 89-288 added "lawful source of income" to § 46a-64 as a new basis for prohibited discrimination with the exception that allows decisions "on the basis of insufficient income. The following year, Public Acts 1990, No. 90-246, now codified as § 46a-64c, adopted a comprehensive fair housing statute, which carried over the language of "lawful source of income" from § 46a-64.
The first question is whether the inclusion of "housing assistance" in the definition of "lawful source of income" was intended to include Section 8 rental subsidies. When "the language of the statute does not illuminate our inquiry, it is necessary to look to other sources for its definition." Lauer v.Zoning Commission, 243 Conn. 485, 490, ___ A.2d ___ (1998). "The court, in construing a legislative act, considers its history, its language, the purpose it is designed to serve and the circumstances surrounding its enactment." Perille v.Raybestos-Manhattan-Europe, Inc., 196 Conn. 529, 537,494 A.2d 555 (1985). In her summary of the bill, Representative Lynn Taborsak, the chief proponent of the bill, included rent subsidies under federal Section 8 programs in the lawful sources of income that would be protected.[3] In explaining why the bill was before the legislature, Representative Taborsak stated that the housing assistance "we provide has been reported as the reason used for rejecting a tenant's application." 32 H.R. Proc., Pt. 25, 1989 Sess., p. 8776. Although Section 8 was mentioned only once in the discussion of P.A. 89-288, Representative Taborsak's inclusion of Section 8 rent subsidies in the lawful sources of income that would be protected went unchallenged during the ensuing debate and the bill passed by a vote of 121 to 26. See 32 H.R. Proc., supra, pp. 8776-94. It has to be concluded, therefore, that the legislature at least commonly understood Section 8 rental subsidies as a form of housing assistance. The broader question, however, is how much weight we can give this single reference to Section 8 considering the implications of mandating participation in the federal program, since there was no discussion of the Section 8 program or its lease requirements.
The CHRO argues that subsequent developments in the legislature addressed this question. House Bill 6286, entitled "An Act Concerning Discriminatory Housing Practices," was introduced in 1991. It provided that a landlord does not discriminate on the basis of lawful source of income when he CT Page 7436 refuses to accept lease conditions associated with the rental of a dwelling to a person whose rental payments are subsidized under the federal Section 8 housing program. Representative Mintz, a proponent of the bill, contended that Section 8 leases were separate from the source of income that they represented, and that P.A. 89-288 only required that one not discriminate against a Section 8 participant, but did not require the signing of Section 8 leases. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1991 Sess., pp. 277-79.
The bill was subsequently not reported out of committee. The following year another bill was introduced, which proposed a number of changes to landlord-tenant laws, including the addition to § 46a-64c of the same language that had been proposed in H.B. 6286. Although H.B. 5008 eventually passed, all references to the question of lawful source of income and Section 8 tenancies were gone.
In Conway v. Wilton, 238 Conn. 653, 678, 680 A.2d 242 (1996), the court was not only reluctant to draw inferences regarding legislative intent from the failure of a committee to report a bill to the floor, but also questioned the use of the legislative acquiescence rule as a tool by which to determine intent. Moreover, the legislative acquiescence rule does not come into play until after an authoritative construction of the statute. See Hall v. Gilbert Bennett Manufacturing Co., 241 Conn. 282,297, 695 A.2d 1051 (1997) (stating "[t]ime and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . .").
Nothing in the later debates is dispositive about the intent of the 1989 bill. It was conceded by both sides during these later debates that § 46a-64c does not explicitly require that the landlord agree to Section 8 leases, but a representative from CHRO stated before the committee that "protection for Section 8 participants was within the intent of the legislature when it passed P.A. 89-288." Conn. Joint Standing Committee Hearings, supra, p. 278. The fact that attorneys practicing in the housing arena testified to the Judiciary Committee two to three years after its passage that such was their interpretation is not dispositive of its proper construction. "Construction of a statute is a question of law for the court." North Haven v.Planning Zoning Commission, 220 Conn. 556, 561, 600 A.2d 1004
(1991). Until the issue is presented to the court for a CT Page 7437 definitive interpretation of the statute in the context of a real factual dispute, legislative inaction is not indicative of acquiescence to a particular interpretation.
Before discussing whether the inclusion of "housing assistance" in the definition of "lawful source of income" can imply mandated participation in Section 8, the court first addresses Sullivan Associates' argument that even if Section 8 voucher holders are protected by the statute, its policy regarding minimum income comes within the exception, which allows a landlord to reject a tenant for "insufficient income." Sullivan Associates requires a minimum income of $38,000/year for an apartment renting for $750 a month. This figure is based on a calculation of rent as equal to one weeks income. Sullivan Associates' principal concern in setting a minimum income requirement is to ensure that the tenants are able to pay the rent and associated expenses such as utilities and repairs.
The statute provides no guidance to determine the sufficiency of income in relation to rent. Sullivan Associates argues that its standard is objective because it is quantitative and applied consistently to all prospective tenants. CHRO contends that allowing the landlord's subjective definition of sufficient income to control undermines the whole purpose of the statute, but rather than offer any other method of objectively appraising sufficiency of income, it tries to apply Sullivan Associates' standard to show that, nevertheless, the relators' incomes are sufficient.
It reaches this conclusion by considering only the portion of the rental payment that the Section 8 tenant pays, $11 in one case, $64 in the other, which amounts to a small percentage of their total income exclusive of the rent subsidies. For example, Roper had a rent subsidy of $686 and other income of $902, for a total monthly income of $1588, or $19,056/year. For the $750/month apartment, she would have to pay $64 out of her income of $902. CHRO claims that 7% of her income for rent is more than sufficient, considering Sullivan's minimum income requirement amounts to 25% for rent.
This calculation supposedly correlates with the defendant's method of determining sufficient income. The court, however, agrees with Sullivan Associates that it is inaccurate to label the $64 contribution Roper makes towards the rent as her sole rental payment.[4] To exclude the rent subsidy from the CT Page 7438 definition of "income" distorts the ordinary meaning of income, which is variously defined as "[t]he amount of money or its equivalent received during a period of time"; American Heritage Dictionary, 2d College Ed.; and "a gain or recurrent benefit that is usually measured in money and for a given period of time." Webster's Third International Dictionary. "If a statute . . . does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) Lauer v. ZoningCommission, 243 Conn. 485, 490, ___ A.2d ___ (1998).
CHRO argues that the HUD portion of the rent is guaranteed so the concern over the tenant's ability to pay the rent is of less significance to the landlord, so that a minimum income requirement is not readily applicable to Section 8 tenants. The rent subsidy is a recurrent benefit and the fact that it is paid directly to the landlord does not remove it from the tenant's income. To argue differently amounts to special pleading for Section 8 tenants and creates the inconsistent result that someone whose source of income is Section 8 gets more protection than one whose source of income is child support or employment, surely not an intended result of the statute. If, for example, a single mother of two had a monthly income of $1588 comparable to Roper's, but which derived solely from alimony and child support, the portion of her income required to pay the rent of $750 would be approximately 50%. The sufficiency of this income to cover the monthly rent is no different from the sufficiency of Roper's income.
Any objective determination of insufficient income must relate to a meaningful economic yardstick that can be equally applied to all, rather than dependent on the nature of the assistance. "[A] statute should be interpreted according to the policy which the legislation seeks to serve." Huck v. InlandWetlands and Watercourses Agency, 203 Conn. 525, 550,525 A.2d 940 (1987). We must avoid a consequence which fails to attain a rational and sensible result which bears most directly on the object which the legislature sought to obtain." Dukes v. Durante,192 Conn. 207, 214, 471 A.2d 1368 (1984). The purpose of the statute was to provide "an equal chance in the rental housing market" for all low and moderate income families. 32 H.R. Proc., supra, p. 8777. Many who spoke on behalf of the bill emphasized this difference between source and insufficiency. See 32 H.R. Proc., supra, p. 8777, remarks of Rep. Lynn H. Taborsak; 32 H.R. Proc, supra, p. 8788, remarks of Rep. Walter S. Brooks; Conn. CT Page 7439 Joint Standing Committees, supra, p. 107, remarks of Ralph Podolsky, representative of Legal Services.
By setting such a high minimum income requirement, a landlord may be discriminating based on economic status, but not on source of income. Although Section 8 status inevitably means low economic status the statute explicitly does not prohibit minimum income requirements. CHRO contends that this means anyone can discriminate by setting a high minimum income, questioning why the legislature would include an exception that would "swallow the rule." That depends on one's interpretation of the rule. The rule is not to protect all low income groups, or a particular subset within the low income group, but to protect all groups from discrimination based on source of income. The societal inequities between low income and high income groups cannot be eliminated by requiring private landlords to ignore income when making business decisions based on a person's ability to pay, regardless of how that person acquires the money or how it is delivered to the landlord.
The simple, if unpalatable, answer is that the exception allows discrimination based on a broader definition, i.e., it allows discrimination against all poor people, regardless of the source of their income. The court sees no other way to interpret this exception. The legislature may decide to prohibit minimum income requirements or to establish a calculus for determining a sufficient minimum, but at this point, the legislature appears to have left it to the business discretion of the property owners.
 II
The determination that Sullivan Associates' conduct falls within the statutory exception would be dispositive of this case. Because Sullivan Associates' policy, however, was to reject Section 8 voucher holders because of the lease terms, which raises an important question of statutory interpretation, the court will address this issue.
On the issue of whether § 46a-64c requires an eligible landlord to participate in Section 8, none of the cases presented by the parties from other jurisdictions that interpret similar statutes are particularly helpful.
Knapp v. Eagle Property Mgmt. Corp., 54 F.3d 1272 (7th Cir. 1995), merely holds that Wisconsin's statute does not include CT Page 7440 Section 8 vouchers in its definition of "income." This can have little bearing on what the Connecticut legislature intended by its use of similar language. The Seventh Circuit does question the wisdom of mandating participation in a voluntary federal program, but does not base its decision on this.
Attorney General v. Brown, 400 Mass. 826, 511 N.E.2d 1103 (1987), holds that a state could require Section 8 participation if it wanted to because the provisions of the federal statute that hold the program to be voluntary have no preemptive effect on a state's authority to mandate participation. The Massachusetts court later explained this statement to mean that refusal to participate in Section 8 is not in itself discriminatory though it might be depending on the landlord's reasons for not participating. See Hennessey v. Berger, 403 Mass. 648,531 N.E.2d 1268, 1271 (1988). This court agrees with the basic conclusion that nothing in the federal program prevents a state from mandating participation.
The New Jersey court in Franklin Tower One v. N.M., 304 N.J. Super. 586,701 A.2d 739 (App.Div. 1997), adopted the reasoning of Attorney General v. Brown concerning preemption and concluded that New Jersey's statute did mandate participation in the federal program "for a landlord who has an existing tenant entitled to use Section 8 voucher payments to assist in rent payments." See also M.T. v. Kentwood Construction Co.,278 N.J. Super. 346, 651 A.2d 101 App. Div. 1994). Both New Jersey cases involved an existing tenant who became eligible for Section 8 after being a non subsidized tenant for some time renting from landlords who had other tenants from whom he had accepted Section 8 payments. New Jersey has an anti-eviction law that requires just cause for any eviction, a provision that Connecticut has rejected consistently. "The purpose of [the anti-eviction statute] is to protect residential tenants from the effects of what the Legislature has deemed to be a severe shortage of rental housing in this state." Harden v. Pritzert, 178 N.J. Super. 237,428 A.2d 927, 929 (App.Div. 1981). "The Act reflects the public policy that landlord rights must, in the interest of general welfare, defer to the needs of the tenant population." FranklinTower One v. N.M., supra, 701 A.2d 742. The court relied on the policy expressed in the Anti Eviction Act concerning displacement to find that the tenants could not be evicted simply because of their current need to rely on Section 8 assistance. Whether the court would find that the anti discrimination statute, N.J.S.A.2A:42-100, by itself would mandate participation is not made clear by these decisions. CT Page 7441
Reviewing these cases only emphasizes the narrow interpretive task for this court of deciding whether our legislature intended to require a landlord to participate in Section 8 if a prospective tenant requested the landlord to accept Section 8 vouchers for payment.
Besides the single mention of Section 8 as a form of housing assistance, no mention was made in the legislative debates of the lease requirements of the Section 8 program. Nevertheless, CHRO states somewhat baldly that the legislature has shown in "unmistakable terms that the requirement of non-discrimination against Section 8 recipients carried with it a requirement that a landlord would have to accept the terms of a Section 8 tenancy." Plaintiff's Brief dated September 12, 1997, p. 12.
There are several things in a Section 8 lease that are different from what Connecticut requires as a minimum agreement between landlord and tenant. The two that Sullivan Associates focuses on are the restrictions on the security deposit and the requirement for a just cause eviction provision. In response to Hanson's request regarding the apartment, Robert Sullivan's secretary stated that as she understood the program Sullivan Associates was not eligible for the Section 8 program because it would not allow a landlord to collect a two month security deposit. Stipulation of Facts, ¶ 12) The regulations limit the amount of security deposit a landlord can collect from a Section 8 tenant to "the greater of one month's Total Tenant Payment or $50. . . ." 24 C.F.R. § 882.112 (a). CHRO claims that this limitation is alleviated by other regulations that provide that the landlord may be reimbursed for up to two months rent by the housing authority at the end of the tenancy for unpaid rent or damages.[5]
General Statutes § 47a-21 sets out in great detail what the legislature has decided is equitable for a landlord to collect as a security deposit, and what benefit the tenant is to receive. For all tenants under the age of 62, the maximum is two months rent, and for those over the age of 62, the maximum is one month rent. § 47a-21 (b). The money must be held in a separate account, and interest paid to the tenant annually. § 47a-21
(i). If state law allows a landlord to collect two months security deposit, a law that would limit that ability would have to acknowledge that limitation. "[S]tatutes are to be interpreted with regard to other relevant statutes because the legislature is CT Page 7442 presumed to have created a consistent body of law." (Internal quotation marks omitted.) Doe v. Doe, 244 Conn. 403, 428, ___ A.2d ___ (1998). It seems inconsistent that a law would allow two months security and then by implication impose a stiffer restriction in certain circumstances without clarifying that intent.
CHRO argues that the only difference in the two procedures is in who holds the money during the tenancy since all interest must go to the tenant under § 47a-21. That statute does not require that all interest go to the tenant, only that amount equal to the average rate paid in savings accounts by commercial institutions as reported in the Federal Reserve Board Bulletin. § 47a-21 (i)(2). As pointed out in Attorney General v. Brown, supra, 531 N.E.2d 1109, "[a]n interest spread of 1% in [the landlord's] favor would be a substantial economic benefit and it does not necessarily follow that his attempt to maintain that benefit constitutes discrimination `solely' because the individuals seeking tenancy were recipients of assistance under the Section 8 program." Indeed, for a landlord with substantial rental properties, that benefit could make the difference between staying afloat financially in the rental housing market and not. The court concludes that there is nothing illegitimate about requiring two months security deposit.
Sullivan Associates' other concern with the Section 8 lease is that it requires a provision that the lease can be terminated only for just cause.[6] Sullivan Associates emphasizes the fact that Connecticut does not have a broad anti-eviction statute that requires a showing of good cause before terminating a tenancy, and the General Assembly has consistently voted against enacting such a statute. See Conn. Joint Standing Committee Hearings, supra, pp. 276-77. The only Connecticut anti-eviction statute, § 47a-23c, applies only to the elderly and the disabled. This is in contrast to New Jersey which has an anti-eviction statute with wide application to most tenancies. Franklin Tower One v.N.M., supra, 701 A.2d 742. As discussed above, this is the primary reason why the New Jersey decisions are less persuasive from Massachusetts, which does not have a broad anti-eviction statute. See Serreze v. YWCA of western Massachusetts,30 Mass. App. 639, 572 N.E.2d 581, 584 n. 10 (1991) ("[i]n Massachusetts, the burden remains on a tenant to establish a reasonable basis to stave off eviction proceedings"). "[S]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law." M. DeMatteo Construction Co. v. New London,
CT Page 7443236 Conn. 710, 715, 674 A.2d 845 (1996). While the court has no opinion as to whether a just cause provision in a lease places an undue burden on a landlord, the fact that it differs from state law applicable to all landlords in the state leads to the conclusion that not agreeing to this term is a legitimate reason to refuse to rent to Section 8 voucher holders.
CHRO claims that the legislature clearly understood at the time § 46a-64c was passed that Section 8 required a separate lease and thus the statute implies that participating in Section 8 would be required in order to comply with the statute. CHRO does not offer any specific evidence of that knowledge, pointing out only that "Section 8 as a lawful source of income does not exist without some lease requirements." Plaintiff's Brief dated September 12, 1997, p. 11. "The intent of the legislature . . . is to be found not in what it meant to say, but in what it did say." Leo Fedus Sons Construction Co. v. Zoning Board ofAppeals, 225 Conn. 432, 441, 623 A.2d 1007 (1993). When a given result depends on the existence of knowledge, particularly of specialized knowledge like the content of federal regulations, that knowledge should not be presumed unless clearly demonstrated. "Courts cannot import into legislation an intent not expressed in some appropriate manner." Skorpios Properties,Inc. v. Waage, 172 Conn. 152, 154, 374 A.2d 165 (1976). The fact remains that mandating participation in Section 8 changes the contours of our landlord-tenant law. "We will not infer that the legislature intended to enact a significant change in existing law without an unequivocally expressed manifestation of legislative intent." (Internal quotation marks omitted.) NewHaven v. State Board of Education, 228 Conn. 699, 719,638 A.2d 589 (1994).
CHRO asks this court to balance the burdens placed on the landlord against the effect of a landlord's refusal to participate in low income housing, and to recognize that the benefits to the poor outweigh the burdens on the landlords. In the process, CHRO advances some compelling policy reasons why participation in Section 8 should be required of all landlords to effectively address the shortage of affordable housing for low income residents. However, "our function is to ascertain what the legislature intended and to enforce that intent rather than to substitute our own ideas of what might be a wise provision in place of a clear expression of legislative will." (Internal quotation marks omitted.) Bridgeport Hospital v. CHRO,232 Conn. 91, 98, 653 A.2d 782 (1995). "It is axiomatic that the court CT Page 7444 itself cannot rewrite a statute to accomplish a particular result. That is a function of the legislature." Leo Fedus SonsConstruction Co. v. Zoning Board of Appeals, supra,225 Conn. 442. "Our function is not to improve legislative actions by reading into the statute what is clearly not there." State v.Plude, 30 Conn. App. 527, 540, 621 A.2d 1342 (1993). "This court must construe the statute as it finds it without reference to whether we feel that the law might be improved by the inclusion of other provisions." Vega v. Waltsco, Inc., 46 Conn. App. 298,304, 699 A.2d 247 (1997).
The later debates that CHRO puts so much emphasis on focused directly on the policy issues of mandating participation in Section 8 and showed a wide disagreement on the meaning of §46a-64c. On the one hand, Representative Tulisano denied that such was the intent of the existing statute, pointing out that the legal requirements of Section 8 were not discussed at the time; on the other hand, Raphael Podolsky of Legal Services said that protection for Section 8 tenants was the most important part of the statute. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1991 Sess., pp. 378-79. If the legislature had actually been focused on Section 8, it could have made the statute more explicitly protective of Section 8, yet the program was mentioned only once during the floor debates. Whether Section 8 imposes undue burdens on landlords contrary to state law is a debate that very clearly did not take place in 1989. Whether it is sound policy to impose such provisions on landlords is something this court should be cautious about adopting without more indication from the legislature. While CHRO may be making some persuasive arguments as to why the law should be this way, its arguments that § 46a-64c makes it this way are not very compelling. There is simply no evidence that the General Assembly intended to mandate participation in Section 8.
 CONCLUSION
The basis for CHRO's argument is the claim that a landlord's refusal to participate in Section 8 is a proxy for discrimination against minorities because the majority of Section 8 voucher holders are low income minorities, and that if landlords don't accept Section 8, then the purpose of Section 8 is lost. CHRO insists that P.A. 89-288 addressed this problem by prohibiting discrimination against Section 8 voucher holders. If there is widespread discrimination, it has not been shown to be based solely on the status of the tenant as recipient of federal CT Page 7445 assistance, but discrimination against the federal regulations. That there is resulting inequity when two persons with comparable incomes do not actually have an equal chance in the private rental market because one is bound by the Section 8 requirements and may have fewer rental opportunities may be an unintended result. If the state legislature wants to throw its support to the federal program it must do that explicitly.
In conclusion, the court finds that there was no discrimination within the terms of the statute.
COCCO, JUDGE