[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 INTRODUCTION
The plaintiffs, Frank W. Bugryn, Jr., Nellie Fillipetti, Mary Dudko, Michael Dudko and John Bugryn[1] brought this action against the defendant, city of Bristol (the city), to restrain the city and its duly authorized municipal agencies, the Bristol Developmental Authority and the Bristol Planning Commission, from taking, in the name of the city, their properties located in the State Route 229 corridor of Bristol for the construction of an industrial park facility pursuant to the Economic Development and Manufacturing Assistance Act of 1990, General Statutes §32-220, et seq. The homeowners seek temporary and permanent injunctive relief in their complaint on the ground that a taking of the homeowners' property under the current circumstances is not for a public use and that the actions taken by the city and the Bristol Development Authority were illegal, arbitrary and an abuse of public trust. After the city filed statements of compensation on the two properties, the homeowners filed motions for temporary and permanent injunctions in those cases. In their motions, the homeowners seek to either stay the proceedings and restrain the city from recording the certificates of taking or restrain the city from taking possession of the property due to following reasons: (a) the acquisition of property is not for a public purpose; (b) the acquisition is not for the purposes stated in the notice dated May 25, 1999; (c) the acquisition of all the property is not necessary for its redevelopment plan; (d) the city failed to make reasonable efforts to negotiate with the homeowners in determining the compensation to be paid; and (e) the plaintiffs currently reside on property and are elderly.[2]
 BACKGROUND FACTS
The origins of the matter at hand are lengthy and convoluted. CT Page 1399 The pertinent background facts are as follows: On May 21, 1998, the homeowners[3] made an application for temporary and permanent injunctions[4] in response to a final letter from the city advising the homeowners it was going to institute condemnation proceedings on the two properties if the homeowners did not accept its last offer for compensation.[5] Thereafter, the court, Holzberg, J., issued an order to show cause for a hearing on the temporary injunctions to be held on June 8, 1998.[6] On December 12, 1998, during the pendency of the hearing for the temporary injunctions, the city filed an application for court-annexed mediation, which was granted on January 5, 1999, by the court, Shortall, J. In mid-April, 1999, the parties met for several days with the court appointed mediator, but the matter remained unsettled.[7]
Thereafter, the city, pursuant to the statutory provisions of General Statutes § 8-129, filed two statements of compensation[8] for the homeowners' properties on May 25, 1999.[9] As a concession to the Bugryn family, the city decided to leave the 8 back acres to the 299 Middle Street property with the homeowners,[10] even though the plan for the Southeast Bristol Mini-Industrial Park, approved by the Bristol Development Authority and City Council provides for the taking of the entire approximately 40 acres.[11] (See Plaintiffs' Exhibit C, current plan.) On June 4, 1999, the homeowners filed motions for temporary injunctions in the two condemnation cases.[12]
The city served notice pursuant to General Statutes § 8-129, and on June 9, 1999, filed the required record of notice with the clerk of the Superior Court. The homeowners filed a motion to consolidate on July 6, 1999,[13] and the three cases pending before this court[14] were consolidated for the purposes of hearing the motions for temporary injunctions regarding the condemnation proceedings.[15] With the hearing action pending, the city refrained from taking any further steps under §8-129.[16]
 DISCUSSION
"An injunction is a harsh remedy . . . and when an equitable injunction is the specific relief claimed, it is incumbent upon the party seeking relief to allege facts showing irreparable damage and the lack of an adequate remedy at law." (Citation omitted; internal quotation marks omitted.) Stoker v. Waterbury,154 Conn. 446, 449, 226 A.2d 514 (1967). "`Adequate remedy at law' means a remedy vested in the complainant, to which he may, CT Page 1400 at all times, resort, at his own option, fully and freely, without let or hindrance." Id. "If the plaintiffs have an adequate remedy at law then they are not entitled to the injunction." Id.
The Economic Development and Manufacturing Assistance Act of 1990, § 32-220, et seq., expressly provides that the condemnation must be conducted in accordance with General Statutes §§ 8-128 to 8-133, the Redevelopment Act.[17]
Sections 8-128 through 8-133 deal with the taking of land by redevelopment agencies.[18] Under § 8-129, title to the property and the right to immediate possession vest in the agency immediately upon the recording of the certificate of taking with the office of the town clerk in which the property is located.[19] Because the provisions of § 8-129 fail to provide the property owner with an opportunity to contest the taking, the plaintiffs are without an adequate remedy at law. SeeBroadriver, Inc. v. Stamford, 158 Conn. 522, 527, 265 A.2d 75, cert. denied, 398 U.S. 938, 90 S.Ct. 1841, 26 L.Ed.2d 270 (1969).
The plaintiffs, however, must also show they will suffer irreparable harm if injunctions are not issued. "[I]rreparable harm arises when there exists no legal remedy furnishing full compensation or adequate redress for a wrong done to or sustained by an individual. The injury or wrong complained of must be serious or material and not adequately reparable by damages at law in that, such damages will not restore the complaining party to the position in which the party formerly stood." Allshouse v.Farmer, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 153327 (March 10, 1997, Tierney, J.). "Although absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable harm." Silitschanu v. Groesbeck, 12 Conn. App. 57, 65,529 A.2d 732 (1987), aff'd, 208 Conn. 312, 543 A.2d 737 (1988). "Whether damages are to be viewed by a court at equity as irreparable or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary measure of the loss suffered." (Internal quotation marks omitted.) Patry v. Board ofTrustees, 190 Conn. 460, 472, 461 A.2d 443 (1983).
Our Supreme Court has repeatedly held that "the issuance of an injunction rests within the sound discretion of the trial court."Anderson v. Latimer Point Management Corp., 208 Conn. 256, 262,545 A.2d 525 (1988). "An injunction is an extraordinary remedy CT Page 1401 which is not mandatory, but is left to the court's sound discretion even if there is a proper showing of irreparable harm." Demers Exposition Services, Inc. v. Porter, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 466718 (September 12, 1995, Goldberg, J.); see alsoGorra Realty, Inc. v. Jetmore, 200 Conn. 151, 165, 510 A.2d 440
(1986) (such relief may be denied even when irreparable harm has been shown). "In exercising this discretion the trial court must balance the competing interests of the parties . . . and the relief granted must be compatible with the equities of the case." (Citations omitted; internal quotation marks omitted.) Dukes v.Durante, 192 Conn. 207, 225, 471 A.2d 1368 (1984). "[T]he exercise of discretion by the trial court [is] in light of the totality of the relevant circumstances." Doublewal Corp. v.Toffolon, 195 Conn. 384, 392, 488 A.2d 444 (1985). "Injunctive relief may not lie where it is predicated on the fears and apprehensions of the party applying for it or where it would be incompatible with the equities of the case. . . ." (Citations omitted.) Karls v. Alexandra Realty Corp., 179 Conn. 390, 402,426 A.2d 784 (1980). "Where the granting of the injunction would cause damage to the defendant greatly disproportionate to the injury of which the plaintiff complains, it may be held inequitable to grant a mandatory injunction and the plaintiff may be remitted to her remedy by way of damages." Moore v. Serafin,163 Conn. 1, 6-7, 301 A.2d 238 (1972); see also Housing Authority v.Water Pollution Control Authority, Superior Court, judicial district of New London at Norwich, Docket No. 3311 (April 19, 1996, Teller, J.) (16 Conn. L. Rptr. 496) (a party seeking injunctive relief has the burden of showing a balancing of the equities in its favor over the hardships to the defendant). "Injunctions should not be issued when damages can adequately protect the injured party." Harvey v. Daddona, 29 Conn. App. 369,377, 615 A.2d 177 (1992).
The plaintiffs requested temporary and permanent injunctions, by their complaint and by their motions in the condemnation cases. "A temporary injunction is a preliminary order of the court granted at the outset or during the pendency of an action, forbidding the performance of the threatened acts described in the original complaint until the rights of the parties respecting them shall have been finally determined by the court." Deming v.Bradstreet, 85 Conn. 650, 659, 84 A. 116 (1912). "The principal purpose of a temporary injunction is to preserve the status quo until the rights of the parties can be finally determined after a hearing on the merits." (Internal quotation marks omitted.) CT Page 1402Clinton v. Middlesex Mutual Assurance Co., 37 Conn. App. 269,270, 655 A.2d 814 (1995); see also Gattoni v. Zaccaro,52 Conn. App. 274, 282, 727 A.2d 706 (1999).
Because a certificate of taking was not recorded, the condition of the parties has remained as it was before the commencement of any of the actions. Therefore, because the status quo has been preserved, temporary injunctions are no longer in issue. The homeowners, however, also requested permanent injunctions restraining the city from taking the properties.
"Permanent injunctions can be granted only after a final hearing on the merits and last indefinitely." 42 Am.Jur.2d, Injunctions § 9 (1969); see also Doublewal Corp. v. Toffolon, supra, 195 Conn. 391 (a court cannot issue a permanent injunction unless the pleadings are closed.) "[T]he trial court does not have authority to render permanent judgments [injunctions] on pending claims where the pleadings are not yet closed." (Internal quotation marks omitted.) Gattoni v. Zaccaro, supra,52 Conn. App. 281. Herein, a trial was held regarding the plaintiffs' claims; thus, consideration of permanent injunctions is proper.
 I IRREPARABLE HARM
This court has determined that the homeowners are without an adequate remedy at law, thereby meeting the first prong for the issuance of an injunction. The homeowners, however, must also meet the second prong by showing that they will suffer irreparable harm if injunctions are not issued. Here, the homeowners allege that they are elderly, reside on the premises, have held these properties in their family for generations and that they do not want to leave their homes.
While this court is sympathetic to the homeowners' situation, this court, in its discretion, does not find the harms the homeowners allege constitute serious or material injuries. Also, this court does not find that there is a substantial probability that but for the issuance of the injunctions, the homeowners will suffer irreparable harm. However sympathetic the homeowners' and their concerns might be, this court notes that injunctive relief may not lie where it is predicated on the fears and apprehensions of the parties applying for it. CT Page 1403
The homeowners also claim federal and state constitutional rights violations due to the city's use of eminent domain allegedly to benefit a private individual or entity, thereby constituting an abuse of the public trust and a taking of privately owned property for a private purpose.[20] It is well established that the takings clause of the Fifth Amendment to the United States Constitution, as applied to the states via theFourteenth Amendment, and section 11 of Article First of the Connecticut Constitution provide protections against the taking of private property for public use[21] without just compensation.[22] "Authority to take by condemnation will be construed in favor of the condemnee and against the condemnor."Torrington v. Coles, 155 Conn. 199, 201, 230 A.2d 550 (1967). Our Supreme Court has held that the "public purpose is not affected by the agency's subsequent resale of the property to private redevelopers with the requirement, . . . [under the applicable statute effectuating the taking], that the land be used according to the redevelopment plan." Fishman v. Stamford, 159 Conn. 116,125, 267 A.2d 443, cert. denied, 399 U.S. 905, 90 S.Ct. 2197,26 L.Ed.2d 560 (1970); see also Gohld Realty Co. v. Hartford,141 Conn. 135, 143, 104 A.2d 365 (1954). Furthermore, our Supreme Court has held that "where the public use which justifies the taking of the area in the first instance exists, an element over which there is no controversy in the present case, that same public purpose continues even though the property is later transferred to a private person." Broadriver, Inc. v. Stamford, supra, 158 Conn. 533; see also Gohld Realty Co. v. Hartford, supra, 141 Conn. 143.
Even construing authority to condemn in the homeowners' favor, based on the evidence presented, this court finds the city's condemnation of the homeowners' properties is not in violation of any constitutional right. The evidence shows the city approached the homeowners with the intention to purchase their properties for the purpose of building an industrial park.[23] Although the city had numerous discussions with and made plans to have Yarde Metals as an anchor tenant in the proposed industrial park, no agreement or contract, written or oral, was made with Yarde Metals. Furthermore, and more telling, the evidence shows the city plans on developing the industrial park whether or not Yarde Metals indeed becomes a tenant. This court notes that even if Yarde Metals becomes the hoped-for anchor tenant, it will have to comply with the developmental plan as approved by the Bristol's Developmental Board and City Council. Therefore, this court finds that the homeowners' claims of constitutional right violations CT Page 1404 are without merit.
This court finds the homeowners do not meet the second prong alleging irreparable harm and this court finds that damages at law by way of fair compensation for their properties can adequately restore the homeowners. Even assuming, however, that the homeowners' allegations constitute irreparable harm or demonstrate a substantial likelihood thereof, granting the homeowners' requests for injunctions must be compatible with the equities of the case. In the following section, this court undertakes a review of the competing interests of the parties with particular focus on the hardships to the city should the homeowners' injunctions be granted. After balancing the equities, this court comes to the same conclusion that the homeowners' injunctions should be denied.
 II BALANCING THE EQUITIES
Although the issuance of an injunction rests within the sound discretion of this court, a "trial court must balance the competing interests of the parties . . . and the relief granted must be compatible with the equities of the case." (Citations omitted; internal quotation marks omitted.) Dukes v. Durante, supra, 192 Conn. 225. In particular, this court notes that a party seeking injunctive relief has the burden of showing a balancing of the equities in its favor over the hardships to the defendant. See Housing Authority v. Water Pollution ControlAuthority, supra, Superior Court, Docket No. 3311. This court recognizes that the hardships to the homeowners are that they are elderly, reside on the property which has been in their family for generations and that they do not want to leave their homes. In contrast, this court recognizes the following hardships to the city if it were to grant the homeowners' injunctions: (a) no other suitable industrial properties in Bristol; (b) no bond posted by the homeowners; (c) the city's monies are tied up in deposits not earning interest; (d) an increased burden on the city's services if the homeowners' properties are developed residentially, as currently zoned; and (e) the need for new jobs in Bristol due to the city's high manufacturing unemployment rate and the large number of shutdowns and downsizings of companies in the last few years. These hardships to the city will each be addressed separately. CT Page 1405
A. No Other Suitable Industrial Property in Bristol.
Our courts have consistently reaffirmed the principle that each parcel of real property is recognized to be in some ways unique. See French v. Clinton, 215 Conn. 197, 200, 575 A.2d 686 (1990). The uniqueness of the homeowners' two parcels is precisely that which creates the conflict with the city. At the trial, the city provided evidence of the unique suitability of the two tracts of land, at 269 and 299 Middle Street, for industrial park development. Specifically, the city cites to the following as making the homeowners' properties uniquely suitable for the proposed industrial park: (1) direct access to Interstate 84 and other major routes; (2) adjacent location to an already existing industrial development allowing for combined development; (3) visibility of the proposed park from State Route 229 (Middle Street); and (4) city services already accessible. These aspects of suitability will be discussed separately.
1. Direct Access to Interstate 84 and Other Major Routes
Evidence was presented that the location of the homeowners' properties location on Middle Street (also known as State Route 229) provides direct motor vehicle access to Interstate Route 84. (See Defendant's Exhibit C, current plan, existing conditions; site description.) Access to Interstate Route 84 is critical because the city expects that proposed tenants at the industrial park will be involved in manufacturing, thereby utilizing large trucks. Evidence shows the homeowners' properties also have access to State Route 72, approximately one mile north and U.S. Route 6, approximately 2.2 miles to the north. Both these routes provide east-west access to the city of Bristol. State Route 229 provides north-south access to the homeowners' properties. The homeowners' properties are located approximately 3.5 miles from Interstate 84, as accessed via State Route 72. Interstate 84 provides east-west access for central and northern Connecticut.
Evidence shows that there are 290 industrial acres available in Bristol. Evidence shows some that of the 290 acres were given to the Nature Conservancy and that some land is currently in farm use. Although some of these other industrially zoned acres are of sufficient size to accommodate the city's proposed industrial park, evidence shows that none of these other parcels provide direct highway access. Testimony repeatedly reaffirms the city's need for highway access for the proposed industrial park tenants. None of the other 290 available acres zoned for industrial CT Page 1406 development in the city of Bristol provide such direct access to Interstate 84. This direct access alone makes the homeowners' properties uniquely suitable for industrial development.
2. Properties Are Located Adjacent to an Already Existing Industrial Development
The homeowners' properties are located adjacent to property of a manufacturer, DANA/Warner Electric Company (formerly Superior Electric). The DANA/Warner Electric Company (DANA/Warner) property, which lies to the south of the homeowners' properties, is an industrial use property with room for expansion. DANA/Warner owns the adjacent industrial zoned property encompassing approximately sixty-eight acres. DANA\Warner is cooperating with the city allowing for combined development of approximately fourteen of its acres with the homeowners' properties. (See Defendant's Exhibit C, current plan). The homeowners' properties are located in the southeast part of Bristol, one of the major industrial areas of the city where there is much development. There are no comparable quality parcels to the homeowners' properties when combined with DANA/Warner's parcel for purposes of development.
Also, evidence shows that the homeowners' properties, in combination with the DANA/Warner property, are of sufficient width and depth to provide adequate access for large trucks. Testimony reveals that the city expects to have tenants involved in manufacturing who will utilize large trucks for distribution. These trucks need adequate room to maneuver, and incoming, outgoing and handling sections are needed for these trucks. The homeowners' properties are uniquely suitable for industrial development because they are located adjacent to an already existing industrial development with room for expansion of sufficient width and depth to provide adequate access for large trucks.
3. Visibility of the Proposed Park from Middle Street
Testimony shows that prospective tenants to industrial parks regard visibility of their expensive facilities as important, and that visibility is part of the total setting of the industrial park. The homeowners' properties front Middle Street, a four lane bi-directional principal arterial road. (See Defendant's Exhibit C, current plan, existing conditions.) There are visibility constraints to the north by approximately thirty single family CT Page 1407 homes and a well treed area. Testimony shows that taking the homeowners' properties and removing all the residential structures located along the Middle Street frontage provides for better, unimpaired visibility of the industrial park. Furthermore, testimony reaffirms the importance of frontage in creating an attractive and visible industrial park and increasing its marketability.
Also, the city is concerned with the present and future appearance of the property, including landscaping, and having control over the property in order to properly maintain its appearance. Currently the homeowner's properties are zoned residential. A ranch-style residential home rests on the approximately .3 acre plot at the 269 Middle Street location. Testimony shows that the residence at 269 Middle Street is currently in good condition. If this relatively small property is not taken along with the 299 Middle Street property, there is evidence problems would arise with carving out a piece of the industrial park. Such problems include the city's need to provide adequate buffer zones because the state requires a fifty foot buffer zone around the industrial park. Buffer zones in turn implicate issues of landscaping and grading of the area. Zoning issues would also arise relating to nonconforming uses within the proposed industrial zoned area for the park.
The property at 299 Middle Street encompasses approximately forty acres in a long, narrow rectangular shape. There is a two story multi-family residence with a detached three car garage located directly at the Middle Street entrance; however, the majority of the property is utilized as a Christmas tree farm.[24] The city is proposing to take thirty-two acres of the property beginning at the narrow end of the rectangle shape of the property fronting Middle Street. (See Exhibit C, current plan; see also Exhibit G, aerial view photograph with overlay.) The house at 299 Middle Street is not in the best of conditions.[25] As with the other parcel, the 299 Middle Street frontage provides needed visibility to the proposed industrial park, and the same issues of appearance, control thereof and marketability of the park arise here. Visibility of the proposed park contributes to making the homeowners' properties uniquely suitable for industrial development.
4. City Services Already Accessible
Evidence shows that both the homeowners' properties already CT Page 1408 have access to major utilities, including city water and sanitary sewers, storm sewers, gas, telephone and electric. (See Defendant's Exhibit C, current plan, existing conditions.) Therefore, the time involved and the costs to the city in developing the homeowners' properties are both substantially lessened. Also, the homeowners' properties are largely vacant, except for the two houses. The financial savings to the city by accessing already existing utilities on the homeowners' properties also contributes to making the homeowners' properties uniquely suitable for industrial development.
Because there is nothing comparable to the homeowners properties within the city of Bristol and their properties are uniquely suitable for industrial development, as discussed above, it would be an inequitable hardship to the city if homeowners' injunctions are granted.
B. No Bond Posted by the Homeowners
In connection with their complaint (docket number 488051) and pursuant to General Statutes § 52-472, on June 1, 1998, the homeowners filed a request that the court waive the requirement of bond for good causes.[26] Should the homeowners be granted injunctive relief, the city is left without compensation for its costs, except for the value of the property, the fate of which is the subject matter of this action. The lack of compensation for the city's costs presents an inequitable hardship to the city if the homeowners' injunctions are granted.
C. City's Monies Are Tied Up in Deposits Not Earning Interest
On May 25, 1999, the city separately deposited $90,000 and $1.2 Million with the clerk of the Superior Court, as required by General Statutes § 8-129.[27] On September 29, 1999, motions for payment of deposit on the two properties were made and signed by attorneys for the city and the homeowners.[28] At trial, the city noted it has lost investment income on this money since May 25, 1999, because the money was removed from the city's coffers and the money is not in an interest bearing account. The city noted that even on a simple interest basis of approximately five percent, the city is losing approximately five thousand dollars per month on the deposited amount for the 299 Middle Street property alone. If the homeowners' injunctions are granted, the absence of the funds from the city's coffers with no acquisition to show for it and the loss of interest income CT Page 1409 present an inequitable hardship to the city of Bristol.
D. Increased Burden on City Services if Properties Developed Residentially
Testimony shows the majority of the 299 Middle Street property is used as a Christmas tree farm, which allows for reduced taxes. Taxes for the 299 Middle Street property (the house and the remaining approximately thirty-nine acres) are assessed at $2100 per year. The property as currently zoned allows for development of small, relatively inexpensive homes. Testimony shows that if the properties are developed as currently zoned, without a counterbalance of industrial development, there would be a net loss to the city because of costs of providing services, particularly schools. If the properties are developed under the proposed industrial zoning by building an industrial park, testimony shows the park would provide the city with acquisition monies from selling the park lots to private entities as well as provide the city with a substantial increase in tax base. If the homeowners' injunctions are granted, the city would suffer inequitable hardship by the increased burden on city services if the properties are developed as currently zoned.
E. Need for New Jobs
Manufacturing employment has steadily declined in Bristol since 1979. The rate of decline from 1990 to 1996 was sixteen percent.[29] Unemployment rates in Bristol in the 1990s have been consistently greater than state and regional averages. (See Defendant's Exhibit C, current plan, employment overview.) Also, there have been many shutdowns and downsizings of companies since the 1970s, many in the last few years,[30] which decreased the number of manufacturing jobs in Bristol.
The Economic Development and Manufacturing Assistance Act of 1990[31] distinguishes between the level of funding that might be available for particular categories of cities and towns within the State based on their financial status. Under the Act, the city of Bristol qualifies as a "targeted investment community" because of its poverty criteria. The city of Bristol has an Enterprise Zone, so under the Act it is eligible for up to ninety percent of funding from the State. Without this status, the maximum amount of funding the State could provide for the proposed industrial park project is fifty percent. Furthermore, the city of Bristol is a public investment community within the CT Page 1410 State of Connecticut because it is among the twenty-five percent poorest Connecticut towns.
Evidence shows the proposed industrial park would provide the city of Bristol with a needed increase in jobs and tax revenues. Evidence also shows the city currently has poverty status and that the Economic Development and Manufacturing Assistance Act could provide the city with a substantial boost in funding the proposed project. These factors, combined with the lack of other suitable industrial development property comparable with the homeowners' properties, would make it an inequitable hardship for the city if the homeowners' requests for injunctions are granted.
 CONCLUSION
This court sympathizes with the homeowners' concerns over losing their homes; however, the fears and apprehensions of the parties applying for injunctive relief are not sufficient to constitute a showing of irreparable harm. This court does not find the disruption to the homeowners that the taking of their property would cause them evinces an irreparable injury. Furthermore, this court finds, based on the evidence submitted, that the homeowners' federal or state constitutional rights have and will not be violated by the taking of their property; and as such, the homeowners have not made their requisite showing of irreparable injury if permanent injunctions are not issued.
Also, as discussed herein, this court finds, based on the evidence submitted, that the balancing of equities does not justify granting the homeowners injunctive relief over the hardships to the city of Bristol due to the unique suitability of the homeowners' properties for development as an industrial park and because the damage to the city by the granting of the injunctions would be greatly disproportionate to the homeowners' injuries. This court determines that just compensation for the two properties to be taken provides an adequate remedy for the homeowners. Therefore, the homeowners' requests for permanent injunctive relief are hereby denied.
Kremski, J.T.R.